Filed 6/16/14  Tutor-Saliba-Perini J.V. v. LA Co. MTA CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| TUTOR-SALIBA-PERINI J.V. et al., | B232372 |
| Plaintiffs, Cross-defendants and Appellants, | (Los Angeles County Super. Ct. No. BC123559 c/w BC132928) |
| v. | |
| THE LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY et al., | |
| Defendanst, Cross-complainants and Appellants. | |
| TUTOR-SALIBA-PERINI J.V. et al., | B237037 |
| Plaintiffs, Cross-defendants and Appellants, | (Los Angeles County Super. Ct. No. BC123559 c/w BC132928) |
| v. | |
| THE LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, | |
| Defendant, Cross-complainant and Respondent. | |

APPEALS from a judgment and postjudgment orders of the Superior Court of Los Angeles County, Carolyn B. Kuhl, Judge.  The judgment in favor of the People of the State of California on the UCL claim is reversed.  The postjudgment order denying the Sureties' motion for attorney fees is reversed and the matter remanded for a determination of the reasonable amount of attorney fees to which they are entitled.  In all other respects the judgment and postjudgment orders are affirmed.

Castle & Associates, Nomi L. Castle, David Romyn, Robert Nida, for Plaintiffs, Cross-defendants and Appellants, Tutor-Saliba-Perini, J.V., Tutor-Saliba Corporation and Perini Corporation.

Castle & Associates, Nomi L. Castle, David Romyn, Robert Nida; Horvitz & Levy, Barry R. Levy and Frederic D. Cohen, for Plaintiffs, Cross-defendants and Appellants, Fidelity & Deposit Company of Maryland, North American Reinsurance, Aetna Casualty & Surety Company.

John Krattli, County Counsel, Charles M. Safer, Deputy County Counsel; Jones Day, Elwood Lui, Daniel D. McMillan and Jeffrey B. Kirzner, for Defendants, Cross-complainants and Appellants, The Los Angeles County Metropolitan Transportation Authority et al.

_____


Tutor-Saliba-Perini, J.V. and its joint venture partners Tutor-Saliba Corporation and Perini Corporation (collectively TSP),[1] on the one hand, and the Los Angeles County Metropolitan Transportation Authority (MTA), on the other, have engaged in contentious litigation for nearly two decades arising from disputes over TSP's performance as one of the prime contractors on the Metro Red Line subway project.  In 1995 TSP sued MTA for breach of contract, seeking $16 million in additional compensation based on 35 claims under four separate contracts.  In 1999 MTA filed a cross-complaint for breach of

---

[1]      In 2008 the two joint venture partners merged to form Tutor Perini Corporation.

contract and violations of the false claims act (FCA) (Gov. Code, § 12650 et seq.) and the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.). MTA's initial 2001 judgment against TSP for $60 million was reversed by this court in 2005. (*Tutor-Saliba-Perini, J.V. v. Los Angeles County Metropolitan Transit Authority* (Jan. 25, 2005, B143430, B158407) [nonpub.] (*TSP I*).) After five more years of protracted proceedings in the trial court, MTA prevailed after a bifurcated jury trial on two breach of contract and FCA claims relating to subway tunnel handrails; the People of the State of California (State), who were allowed to substitute in place of MTA in pursuing the UCL cause of action, were awarded a civil penalty of $2,500; many of the remaining claims and cross-claims were dismissed through pretrial rulings in so-called *Cottle* proceedings; others were withdrawn or abandoned; and MTA consented to judgment being entered in favor of TSP on the remaining contract claims. The court entered a net judgment of $3 million in TSP's favor.

TSP appeals the relatively small award against it under the FCA relating to tunnel handrails ($334,953.48), explaining any false claim penalties can have a significant, negative impact on future bids for public works contracts. TSP also appeals from the grant of nonsuit on its claim relating to extra costs incurred by the elimination of night construction and the trial court's issue sanction that barred TSP's street restoration and project completion delay claims. TSP also contends the trial court failed to follow this court's mandate in *TSP I* to enter judgment in its favor on the UCL claims and erred in permitting the State to substitute for MTA.

MTA and the State have cross-appealed from the nonsuit ruling on their claims against TSP under the FCA and UCL and for breach of contract to recover payments made pursuant to change orders involving reduction in the permissible noise levels for night work, contending the trial court improperly resolved questions of fact regarding scienter and materiality. However, in their cross-appellants' reply brief MTA and the State expressly label their cross-appeal on the night restriction claims as "protective," urging this court to bring the litigation to a close and disclaiming any interest in a reversal

3

of that nonsuit ruling unless we reverse the rulings against TSP and remand the matter for further trial.

In a separate, but related, appeal TSP and the issuers of its public works bonds—Fidelity & Deposit Company of Maryland; North American Reinsurance, currently doing business as Swiss Reinsurance America Corporation; and Aetna Casualty & Surety Company, currently doing business as Travelers Casualty & Surety Company (collectively the Sureties)—appeal from the order denying their joint motion for attorney fees. We advised the parties we would consider the appeals together for purposes of oral argument and decision.

We affirm the verdict and award in favor of MTA on the tunnel handrail claims, reverse the award in favor of the State on the UCL cause of action, and reverse the postjudgment order denying the Sureties' motion for attorney fees and remand for a determination of the reasonable attorney fees to which they are entitled. In all other respects we affirm the judgment and postjudgment orders of the trial court, including its denial of TSP's motion for attorney fees.

## FACTUAL AND PROCEDRUAL BACKGROUND

1. *TSP's Complaint; MTA's Cross-complaint; the First Trial; and <u>TSP I</u>*

As the lowest responsible bidder, TSP was awarded the prime contracts for three adjacent Metro Red Line stations and tunnels along the Wilshire corridor, designated B211, B221 and B231. Each contract required TSP to fully perform for a fixed price equal to its low bid, subject to reimbursement for additional costs arising from any material changes to the contract including delays caused by MTA, undisclosed geologic conditions, acts of God and subsequent MTA modifications to the project plans upon which TSP based its bid. To receive such reimbursement, TSP was required to prepare "change orders," which were submitted for approval to MTA's outside construction manager (Parsons Dillingham) and MTA staff.

Other than with respect to the issue of attorney fees, this appeal involves only the B221 contract for construction of the subway tunnel between Wilshire/Vermont and

4

Wilshire/Western and the subway station at Wilshire/Normandie and several related structures. Although a substantial number of TSP's change-order claims for the B221 contract were paid by MTA, totaling millions of dollars, others were disputed and became the subject of TSP's 1995 lawsuit for breach of contract and breach of implied warranty, which, as filed, also included claims involving the B211 and B231 contracts and sought recovery of more than $16 million for disputed change orders that MTA considered improper.[2]

In early 1999, after the parties had announced ready for trial, MTA was granted leave to file a cross-complaint against TSP alleging breach of contract and violations of the FCA and UCL. The theory underlying MTA's cross-complaint was, in large part, that TSP had deliberately underbid the contracts in order to have the lowest responsible bid, while always intending to submit a substantial number of specious change orders to recoup its real costs and generate a sizeable profit. The cross-complaint also sought to recover on public works bonds from the Sureties, which were named as cross-defendants.

The numerous discovery battles between TSP and MTA before and after the filing of the cross-complaint are detailed in *TSP I*. As we explained, ultimately the trial court imposed pretrial monetary and issue sanctions against TSP and its counsel Castle & Lax based on their failure to provide discovery. In addition, the court granted a series of motions for summary adjudication pursuant to Code of Civil Procedure section 437c, subdivision (f)(1), directed to a number of the specific claims for reimbursement made by TSP within its causes of action for breach of contract and breach of warranty, eliminating more than 80 percent ($13 million) of TSP's affirmative claims. Then, during the eighth week of a jury trial on TSP's remaining claims and on MTA's cross-complaint, MTA moved for terminating sanctions based on apparent additional discovery violations. After giving TSP a limited time to respond, the court granted the motion for full terminating

---

[2] The breach of warranty claims alleged TSP had relied on unclear plans and specifications provided by MTA and, as a result, had incurred greater costs than anticipated.

issue and evidentiary sanctions: "The facts shall be taken as established that there is no liability on the part of MTA on any of the causes of action by TSP against MTA in its pleadings. [¶] The facts shall be taken as established that the cross-defendants are liable to MTA as to each cause of action alleged in the pleadings of cross-complainant. [¶] . . . [T]he Court is imposing an evidence sanction prohibiting TSP and the cross-defendants from offering any documentary evidence regarding the damages alleged by MTA. [¶] Plaintiff and Cross-Defendants may call witnesses, cross-examine witnesses and argue the issue of damages to the jury but may not make use of any documentary evidence."

Following issuance of the trial sanctions order, trial continued with MTA presenting evidence on its cross-complaint, largely through the testimony of expert witnesses. The court instructed the jury TSP was liable for breach of contract and for 1,048 violations of the FCA and UCL. After deliberating for six days, the jury awarded MTA more than $17 million in contractual and statutory damages and penalties under the FCA and UCL against TSP and the Sureties. The jury also awarded MTA $11 million as disgorgement of profits from TSP. The judgment entered by the trial court included an additional $2.4 million in prejudgment interest and $31 million in attorney fees and costs.

We reversed the judgment on appeal, holding in *TSP I* the trial court had erred in imposing mid-trial terminating and issue sanctions because TSP had not received either proper notice of the type of sanctions being sought and the grounds asserted by MTA or adequate time to prepare its response. In addition, the sanctions as imposed were impermissibly overbroad.[3] We recognized MTA could pursue its request for additional discovery sanctions on remand if TSP was provided a fair opportunity to respond to the specific allegations upon which any renewed motion was based and reminded the trial court, in determining the appropriate sanctions, if any, to consider that, in the absence of an empanelled jury and the accompanying time constraints on the production and analysis

---

[3] We also reversed several of the monetary sanctions imposed against TSP's counsel Castle & Lax for purported discovery violations.

6

of previously withheld documents, less severe sanctions may be sufficient to redress the harm done by any improper withholding of documents.

We also reversed the trial court's orders granting summary adjudication in favor of MTA on multiple motions directed to "issues" rather than "causes of action" within the meaning of Code of Civil Procedure section 437c, subdivision (f). Accordingly, on remand retrial of most of TSP's claims and MTA's cross-claims would be necessary. However, in *TSP I* we also held TSP was entitled to judgment on MTA's claims under the UCL because MTA was not a "person" within the meaning of the statute and, therefore, lacked standing to sue and also because only authorized prosecutors suing in the name of the People of the State of California may recover civil penalties under Business and Professions Code section 17206.

2. *The Trial Court Permits MTA To Amend Its UCL Claim To Add the State*

On remand MTA moved to add a party to its cross-complaint, substituting the State, as represented by the Los Angeles County District Attorney, for MTA as the entity asserting the UCL claims. TSP opposed the motion and requested the court enter judgment in its favor on those claims. A January 20, 2006 minute order states TSP's request "is signed by the Court and filed this date."[4] Nonetheless, after continuing the matter for a brief period, on January 25, 2006 the court granted MTA's motion to substitute the State in place of MTA on the UCL claims. The actual judgment reciting that MTA recovered nothing on the UCL claims was not entered by the court until April 4, 2011 (made effective, nunc pro tunc, as of February 9, 2011).

---

[4] The form of order submitted by TSP and apparently signed by the trial court stated, "In accordance with the Decision issued by the Court of Appeal on January 25, 2005, judgment shall be entered on the Unfair Competition Law (UCL) claims in favor of Tutor-Saliba-Perini, J.V. and its joint venture partners Tutor-Saliba Corporation and Perini Corporation."

3. *The Bifurcated Trial Regarding the Tunnel Handrail Claims*

In June 2006, at the request of MTA, the court bifurcated for trial MTA's allegation TSP had submitted false claims and breached the B221 contract when it sought additional funds for installation of handrails throughout the tunnels. MTA's theory was that TSP knew the plans called for tunnel handrails when it bid for the B221 contract and falsely implied it had not included those costs in its bid. TSP contended the contract required installation of handrails only in the cut-and-cover areas of the project— specifically the Wilshire/Normandie station, the Vermont turn-out structure and the emergency exit shafts—not in the miles of deep bore tunnels that ran between stations.[5] Alternatively, TSP insisted ambiguities in the plans misled it into omitting handrails from the subcontract it entered with subcontractor Allstar Steel, Inc.

TSP's change order request to cover the additional costs to be paid Allstar Steel was initially rejected by MTA and then submitted to a dispute review board (DRB) pursuant to the B221 contract. The DRB delivered a nonbinding ruling in favor of TSP. MTA accepted that ruling and issued a change order authorizing TSP to receive an additional $111,651.16 to install tunnel handrails. TSP subsequently submitted two payment requests after Allstar Steel completed its work. In its cross-complaint MTA alleged the two payment requests violated the FCA because of false statements made by TSP in connection with the change order request.

Trial began in November 2006. After the presentation of evidence, the jury was properly instructed TSP was not liable under the FCA for requesting additional money to install tunnel handrails if its contract with MTA did not require it to install the handrails. In December 2006 the jury found in favor of MTA, concluding TSP had breached the contract and submitted two false handrail claims under the FCA, damaging MTA in the

---

[5] In cut-and-cover construction the pavement of the street is removed, a hole for the station and adjacent subway tunnel is dug and then the street is restored. In deep bore tunneling boring machines are inserted into a hole dug at a designated point along the proposed subway line and the tunnel is carved out through the earth.

sum of $111,651.16, the amount MTA had paid TSP for the tunnel handrail. (These damages were trebled under the FCA.) The court thereafter found in favor of the State on a single UCL violation based on the two false claims and awarded it a civil penalty of $2,500.

      4. *The* Cottle *Proceedings and Additional Evidentiary and Issue Sanctions Against TSP*

Utilizing a procedure approved for complex cases by this court in *Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367 (*Cottle*),[6] the trial court and the parties agreed the court would evaluate the evidence and decide questions of law to determine whether a prima facie case had been established for a number of the claims advanced by TSP and MTA. The court ultimately concluded most of MTA's FCA claims were either not cognizable as a matter of law or not supported by sufficient evidence. Several of TSP's remaining claims were precluded as well. As it relates to this appeal the court granted nonsuit as to TSP's night restriction claims against MTA and MTA's night restriction claims against TSP and the State's corresponding UCL claim.

---

[6]     In *Cottle, supra,* 3 Cal.App.4th 1367, a trial court presiding over a complex toxic tort action entered a case management order requiring each plaintiff to submit a statement providing prima facie evidence of the nature of plaintiff's injuries and the identity of each medical expert who would support the personal injury claim. (*Id.* at p. 1381.) Although the court gave plaintiffs multiple opportunities to comply with the order, none was able to provide any medical evidence the injuries claimed had been caused by the contamination. Immediately before trial, the court entered an order excluding any evidence of plaintiffs' physical injuries. In a divided opinion, we upheld the use of these procedures, explaining "in a complex litigation case . . . a court may order the exclusion of evidence if the plaintiffs are unable to establish a prima facie claim prior to the start of trial." (*Id.* at p. 1381.)

    Other appellate courts have approved *Cottle*'s holding that "a trial court may use its inherent powers to manage complex litigation by ordering the exclusion of evidence if the plaintiff is unable to establish a prima facie case prior to the start of trial." (*Lockheed Martin Corp. v. Continental Ins. Co.* (2005) 134 Cal.App.4th 187, 211-212, disapproved on another ground in *State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1036, fn. 11.)

In another pretrial proceeding the trial court granted MTA's motion to preclude TSP from introducing any scheduling information in support of its claim for additional compensation based on alleged MTA-caused delays in completion of TSP's work as an evidentiary sanction for destroying the computer hard drive that contained the scheduling information. The court subsequently expanded its sanction to bar TSP from presenting any evidence to support this claim.

### a. *The night restriction claims*

The B221 contract permitted TSP to perform night construction work on the Wilshire/Normandie station and adjacent structures provided the noise level stayed within limits set by the terms of a variance issued by the Los Angeles Police Commission. After several weeks of night work by TSP, and following complaints from neighborhood residents and businesses, the Los Angeles Police Department redetermined the ambient noise level in the construction area, which, in turn, reduced the maximum permissible noise level under the variance (according to TSP, a reduction to a level on the logarithmic scale one-half that of the earlier level). MTA directed TSP to suspend all night work on the station rather than authorizing expensive sound attenuation measures.

TSP asserted it had bid the B221 contract on the assumption it would be able to do a certain amount of night work and submitted change order requests for additional costs it was incurring because it was no longer able to do so. MTA agreed to pay these change orders, totaling nearly $3 million. However, when TSP completed its work on the Wilshire/Normandie station and submitted another change order request for more than $5 million in additional costs incurred on the station's box structure as a result of the reductions in permissible noise levels for night work, MTA refused to issue the change order. TSP's initial complaint for breach of contract included a claim based on MTA's refusal to issue this change order.

In its cross-complaint, filed after significant discovery had already occurred, MTA alleged it had learned TSP never intended to perform construction work on the station at night and had made false statements to MTA to obtain payments for those night

restriction change orders that had been approved. MTA sought to recover those payments, alleging they had been obtained in violation of the FCA and UCL, as well as in breach of the parties' contract.

The trial court directed the parties to submit evidence for a pretrial *Cottle* proceeding on their respective night restriction claims. After briefing and oral argument the court granted nonsuit on TSP's claim, ruling the contract gave TSP only a conditional right to work at night and TSP bore the risk under the contract that permissible maximum night noise levels might be reduced under the variance. With respect to MTA's cross-claims, the court ruled MTA had failed to establish a prima facie case under the FCA because, although the claim was false in the sense there was no contractual guaranty of the right to work at night and thus TSP had no contractual right to receive additional payments, no evidence had been presented its claims were knowingly false. The court found TSP's erroneous interpretation of the contract on this point was not so frivolous as to give rise to an inference TSP knew its payment request lacked merit. Finally, the court concluded any false statements that may have been made in connection with the payment requests were not material. The court granted nonsuit on MTA's related claims for breach of contract and the State's cause of action for violation of the UCL on the ground they were "premised on the establishment of a False Claims Act violation."

b. *Evidentiary and issue sanctions affecting TSP's delay claims*

TSP sought additional compensation for increased costs due to delays allegedly caused by defects in the design for rebuilding Wilshire Boulevard (new curbs, gutters, sidewalks, street paving, landscaping and other work) after it had completed the subsurface station and tunnel segment (the street restoration delay claim). TSP also complained MTA had delayed its completion of the project in other ways, including design changes to the Wilshire/Normandie station's electrical systems, and requested compensation for the additional costs associated with those delays (the project completion delay claim). TSP intended to support those claims, which totaled more than $1.6 million, through use of a baseline schedule it had developed at the outset of

11

construction that described when it expected various work to be performed and monthly updated schedules generated using a software program (Primavera).

Before the first trial MTA served TSP with a discovery request to produce TSP's scheduling records, including computer files containing the monthly updated schedules. After the discovery referee resolved various disputes, TSP produced 57 diskettes of scheduling information. MTA subsequently learned those diskettes did not include a "master" or "interface" Primavera schedule that TSP had prepared that included not only work on the B221 contract but also work on TSP's other Red Line contracts including B211 and B231. MTA demanded TSP produce this additional scheduling information. TSP then revealed it no longer had the hard drives containing that information and could not comply with the additional demand. The trial court imposed evidentiary sanctions, ruling TSP's expert could not offer any testimony derived from the missing hard drives.

As discussed, in *TSP I* we recognized MTA could pursue additional discovery sanctions on remand if TSP was given appropriate notice and an opportunity to respond. On remand MTA filed several motions, first seeking evidentiary sanctions and thereafter issue sanctions barring the delay claims, based on what it asserted was TSP's intentional destruction of the hard drives that contained scheduling information. The court received documentary evidence and live testimony, allowed extensive briefing and heard argument at numerous hearings before ruling that TSP could not submit any evidence on its street restoration and project delay claims.

The trial court explained, "Possibly it should have been apparent to this court at an earlier stage of this litigation that the relief requested by MTA in the motions in limine referenced above (seeking to preclude TSP from putting on any evidence of its delay claims) should have been granted. However, the court attempted to give TSP every opportunity to demonstrate that its delay claim could be tried despite the evidence sanction this court earlier determined to be appropriate. In any event, it is now clear to this court (after having obtained a better understanding of the import of TSP's delay claim and the evidence on which it depends) that TSP's discovery violation would so

12

substantially impair MTA's ability to defend against TSP's delay claim that fundamental fairness requires the delay claim itself to be precluded."

5. *Resolution of the Remaining Claims and Entry of Judgment*

After the court's pretrial rulings eliminated most of the unresolved claims in the lawsuit, MTA filed notices consenting to entry of judgment in favor of TSP on nine remaining TSP claims, which, MTA explained, were no longer cost-effective to defend. (MTA expressly stated its consent was "for judicial efficiency and [is] not an admission[] of liability.)  MTA also withdrew those affirmative claims it still had in the litigation, and the State withdrew the corresponding claims under the UCL.

The trial court entered judgment on February 9, 2011 in favor of TSP and against MTA in the net amount of $3,015,362.36:  the principal sum of $1,675,689 for those claims as to which MTA had consented to entry of judgment, plus the stipulated sum of $1,866,631for prejudgment interest, less the $334,953.48 awarded to MTA in damages under the FCA, the stipulated sum of $172,044.16 in prejudgment interest on the FCA damages, and $20,000 in civil penalties also awarded to MTA under the FCA.  Judgment was entered in favor of the State for $2,500 as a civil penalty under the UCL.  The judgment provided entitlement to, and the amount of, costs and attorney fees, if any, would be added to the judgment pursuant to postjudgment proceedings.

6. *Denial of Attorney Fees*

Although none of the TSP-MTA Red Line contracts (B211, B221 and B231) contained attorney fee provisions, the performance bonds obtained by TSP did.  Based on the attorney fee provisions in the performance bonds, TSP and the Sureties jointly moved after judgment for an award of fees:  TSP sought approximately $21.6 million in fees; the Sureties approximately $600,000.  The trial court denied the motion, concluding (a) there was no contractual basis for an award of fees to TSP; (b) TSP and the Sureties were not prevailing parties under the relevant contracts; and (c) the Sureties were not entitled to recover fees on the alternate ground that MTA's FCA claims were "clearly frivolous,

13

clearly vexatious, or brought primarily for purposes of harassment." (Gov. Code, § 12652, subd. (g)(9)(B).)

## CONTENTIONS

TSP contends the portion of the judgment finding it violated the FCA should be reversed because MTA's plans on their face did not require tunnel handrails; even if the plans were ambiguous, TSP was misled to its detriment by those ambiguities; and the court improperly instructed the jury on MTA's burden of proof on the FCA claims. TSP also contends the court erred in granting nonsuit on its claim for additional compensation arising from reductions in the permissible noise levels for night work and in granting MTA's motion for issue sanctions that precluded TSP's street restoration and project completion delay claims based on its failure to comply with orders to produce computer hard drives with its scheduling information. Finally, TSP contends the court erred in allowing the cross-complaint to be amended on remand following *TSP I* to add the State as the party asserting the UCL claims after this court ordered judgment be entered on those claims in favor of TSP. In its protective cross-appeal MTA contends the trial court erred in granting nonsuit on its cross-claims seeking to recover payments made to TSP under several night restriction change orders. Finally, in the related appeal regarding attorney fees, TSP and the Sureties contend they were entitled to an award of attorney fees under Civil Code section 1717 (section 1717) as the prevailing parties in the actions against them on the performance bonds on the B211 and B231 contracts, and the Sureties also contend they are entitled to attorney fees under section 1717 on the B221 bond and under the FCA, which gives a prevailing defendant a right to fees when the court determines the FCA action was frivolous.

## DISCUSSION

1. *The Trial Court Properly Entered Judgment in Favor of MTA on the FCA Tunnel Handrail Claims*

   a. *TSP's requests for additional compensation it had paid its subcontractor*

TSP initially awarded the metal fabrication subcontract to Jefco Benders, Inc. after soliciting bids from qualified disadvantaged business enterprises (DBE) and women

14

owned enterprises (WOE). As TSP acknowledges, TSP assumed Jefco Benders included handrails in the tunnels in its $997,000 bid and used Jefco Benders's pricing when it submitted its own bid to MTA, agreeing to perform the metal fabrication work for $1 million. After TSP won the contract, however, Jefco Benders requested to be released from its subcontract obligations because it was unable to obtain necessary financial guarantees.

To replace Jefco Benders TSP contacted the DBE subcontractors who had previously submitted bids for the metal fabrication work and asked if any would agree to do the work for the same or lower price as had been bid by Jefco Benders. None would. After MTA refused to permit non-DBE subcontractors to replace Jefco Benders, TSP solicited new bids from the DBEs. The solicitation letter referred to various specifications and plans including ones that TSP concedes it believed required handrails throughout the B221 project. Allstar Steel, one of the original DBE bidders for the metal fabrication work (whose original, higher proposal included tunnel handrails), submitted a bid of $972,000. TSP accepted the bid but, at Allstar Steel's request, amended the subcontract, which had previously required the subcontractor to perform work required by specification 5500 "including but not limited to" a list of 30 items, to provide Allstar Steel would furnish and install metal fabrications as listed in the identified plans and specifications "including, and limited to" the list of 30 items.[7]

TSP believed the contract with Allstar Steel, like the contract with Jefco Benders, obligated the subcontractor to install all required handrails, including handrails in the tunnels. Allstar Steel, however, took the position that, although tunnel handrails were required by MTA's plans when read as a whole, they were not mandated by the specific

---

[7] Allstar Steel's president, Mauricio Lopez, testified he requested the change because he wanted to be responsible only for the specific items TSP had requested and to avoid anything being left "up in the air." TSP's president, Ron Tutor, who initialed this change in the subcontract language, on the other hand, testified at trial he viewed the change as meaningless, with no bearing on the scope of the work to be done by Allstar Steel.

15

drawings listed in Allstar Steel's subcontract. In fact, by modifying the subcontract language, Allstar Steel had intended to exclude tunnel handrails from the work it had committed to perform.

TSP submitted a change order request to the B221 construction manager, explaining the request was made because the plans and specifications were ambiguous. Properly construed, TSP contended, they did not call for tunnel handrails. TSP requested an additional $116,758 to install the handrails, $111,198 to cover Allstar Steel's additional costs plus TSP's 5 percent markup. As discussed, MTA rejected that request; and TSP submitted the issue to a DRB, which issued a nonbinding decision in favor of TSP, based on submissions by TSP and Allstar Steel, concluding that tunnel handrails were not clearly shown in the B221 contract and that a change order should issue that would compensate TSP and Allstar Steel for the cost of furnishing and installing handrails. MTA accepted that ruling and issued a change order authorizing TSP to receive an additional $111,651.16 to install tunnel handrails. TSP subsequently submitted two payment requests after Allstar Steel completed its work—the basis for the finding of two FCA violations.

   b. *TSP's request for additional compensation for tunnel handrails was a false claim within the meaning of the FCA*

The FCA prohibits knowingly submitting a false or fraudulent claim for payment to the government and knowingly making or using a false record or statement material to a false or fraudulent claim. (Gov. Code, § 12651, subd. (a)(1) & (2).)[8] A false claim or false record or statement in support of a false claim must be literally untrue. (See *Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 548-549 [the word "false" in the FCA has no special meaning].) However, a specific

---

[8]    At the time of trial in this case, these provisions of the FCA referred only to a "false claim," rather than a "false or fraudulent claim." In addition, the 2009 amendment to the FCA, effective January 1, 2000, added the word "material" to the language of Government Code section 12651, subdivision (a)(2). (See Stats. 2009, ch. 277, § 2.) These changes have no bearing on the issues presented by TSP's appeal.

intent to defraud need not be proved for a false claim to be made "knowingly." (Gov. Code, § 12650, subd. (b)(3).) In addition, although "actual knowledge of the information" satisfies the "knowingly" element (Gov. Code, § 12650, subd. (b)(3)(A)), "[t]he [FCA] does not demand a deliberate lie but allows for liability where the defendant acts in deliberate ignorance or in reckless disregard of the truth of the claim." (*Thompson Pacific Construction*, at pp. 549-550.)

TSP correctly asserts (as the jury was instructed) it cannot be liable for violating the FCA for requesting additional compensation for work that was not included within the B221 contract and related plans—such a claim would not be false. It then contends MTA's plans did not call for installing handrails throughout the tunnels and urges us to determine whether installing tunnel handrails fell outside the scope of the B221 contract de novo, as a pure question of law, unaided by resolution in the trial court of any conflict in extrinsic evidence. TSP's argument this court should conduct a de novo review of the contract documents is flawed.

In support of its position TSP insists the B221 contract's drawings and specifications identified every location where handrails were to be installed. TSP presented evidence in the trial court and argues on appeal that those documents required handrails made of stainless steel in the public stairways and handrails made of galvanized steel at specific locations in exit shafts, nonpublic stairwells and service walkways of the Wilshire/Normandie station. Nowhere, according to TSP, did the drawings and specifications call for handrails to be installed in the tunnels. Yet, although maintaining the contract was unambiguous on this point, TSP presented an expert (Carl La Fraugh) to support its construction of the contract's requirements.[9]

---

[9] "Q. [by TSP's counsel] Did you analyze the contract documents to see whether or not they included the tunnel handrail for the full length of the tunnel?
"A. Yes.
"Q. What did you conclude?

17

MTA argued to the contrary and presented its own expert (Winston Wightman) to provide a foundation for its interpretation that the contract required handrails throughout the tunnel, which Wightman explained were necessary for safety purposes: The walkways in the tunnels are narrow (30 inches); workers in the tunnel need handrails to hold when a high-speed train goes by; and passengers may need them if the power goes out because the tunnel walkways are used for emergency egress.[10]

One fundamental dispute between the experts was the meaning or significance of a wavy line in Drawing 303 at the juncture of the cut-and-cover structure (that is, the station) and the tunnel structure. According to MTA's expert, the wavy line meant the handrail continued the full length of the tunnel: "Here we can see this is the tunnel. This portion is the cut and cover. We know that because we can see the open cover support. There are pilings supporting the excavation, and we can see handrail. Here is handrail in the tunnel, it continues on through the interface and it is also shown in the cut and cover.

---

"A. I concluded that the contract documents did not indicate handrail for the full length of the tunnel."

[10] "Q. [by MTA's counsel] Mr. Wightman, did you review the contract documents for contract B221 in order to determine whether tunnel handrails were required by those contract documents for the full length of the tunnels?

"A. Yes, I did.

"Q. What opinion did you form?

"A. It is my opinion that they were clear—they clearly indicated that tunnel handrails were required throughout the tunnel, with the exception of the cross-passages.

"Q. And what are those?

"A. The cross-passages are openings to allow access from one tunnel to the other.

" . . . .

"Q. Except for those cross-passages you found the requirement of tunnel handrails for the full length of the tunnel?

"A. Yes, I did."

18

That is shown continuously. It is not only in the cut and cover sections, but it just confirms what we saw before. That where there is tunnel, there is a handrail.

"Q. [by MTA's counsel] Mr. Wightman, we see the handrail that goes into the tunnel structure. It stops there at that wavy line. In construction terminology what does that wavy line mean?

"A. You pointed out a few minutes ago on drawing 206 the match line. It just shows that the work continues beyond that point. The wavy line indicates that this is not the end of the tunnel, it is just the end of this drawing. But the tunnel continues on. But this is all that is going to be shown in this drawing."

According to TSP's expert, in contrast, the wavy line only meant the handrail continued for some unspecified distance away from the vicinity of the station. Based on other drawings and specifications, he concluded the handrail extended only five feet beyond the point shown on the drawing.

"Q. [by MTA's counsel on cross-examination] Here is a drawing which was looked at a while ago which shows the handrails, and it shows the transition from the cut and cover structure to the tunnel, and it shows a wavy line here. And you know in the construction industry that means, that wavy line means it continues, all these continue into the tunnel, right?

"A. Continue for some distance. It [doesn't] define how far they continue.

"Q. And so what you concluded from that last detail we looked at, the bracket spacing detail, that the tunnel handrail goes five feet in this direction and stops?

"A. Five feet from the first support. . . ."

In qualifying their respective experts both TSP and MTA emphasized their training as civil engineers, their many years of experience in the construction field and the thousands of heavy construction projects in which they had been involved in analyzing plans for estimating and bidding purposes.[11] Relying on their experience and

---

[11] For example, La Fraugh, TSP's expert, was asked by TSP's counsel, "In your years as an independent expert, have you often been called upon to evaluate the meaning

19

expertise and focusing on different drawings that were part of the B221 contract, the two experts reached different conclusions regarding whether the contract required handrails to be installed along the full length of the tunnels. Both interpretations of the contract plans and specifications are reasonable; accordingly, it was proper for the trial court to admit this extrinsic evidence to assist in interpreting the B221 contact. (See *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39-40 [if extrinsic evidence reveals that apparently clear language in the contract is, in fact, "susceptible to more than one reasonable interpretation," it may be used to determine contracting parties' intent]; *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126 [if, in light of the extrinsic evidence offered, language in a contract is reasonably susceptible to the interpretation urged, the extrinsic evidence is admissible to aid in interpreting the contract]; see generally *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395; Code Civ. Proc., § 1856, subd. (g) [extrinsic evidence admissible to interpret terms of ambiguous agreement].) The task of resolving the conflict between the two conflicting experts' views was for the jury. (*City of Hope*, at p. 395; *Wolf*, at p. 1127.)

TSP acknowledges, as it must, that expert opinion is admissible to help construe technical terms in construction contracts (see, e.g., *Bailey v. Breetwor* (1962) 206 Cal.App.2d 287, 291; see also *Asso. Lathing etc. Co. v. Louis v. Dunn, Inc.* (1955) 135 Cal.App.2d 40, 47 [parol evidence admissible to construe phrase relating to specialized business "even if to a layman the phrase was clear and unambiguous"]) and that, if there is a conflict in how the experts construe technical terms, it is for the trier of fact to resolve that conflict (*Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d

---

of construction plans and specifications?" He responded, "Yes. That is a normal duty that I have to perform on virtually every assignment that I consult on. Q. Can you give us an estimate about how many such evaluations of plans and specifications you have made? A. It would be in the thousands. Because each project that you consult on, you have to make many evaluations, because oftentimes there is more than one dispute or one subject within a dispute, with each one being evaluated independently."

20

285, 289 (*Warner Construction*) ["since the interpretation of the crucial provisions turned on the credibility of expert testimony, the court did not err in submitting the construction of the contract to the jury"]). Yet TSP attempts to dismiss the significance of the experts' directly opposing testimony, for example on the meaning of the wavy line in Drawing 303, by citing cases that hold expert opinion on the meaning of the written instrument ("the ultimate question of law") or what the parties intended is usually inadmissible and then, somewhat disingenuously, arguing there were no conflicts among the experts about what the contract specifications stated or what the technical drawings actually depicted. (See, e.g., *In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 51; *Schaffter v. Creative Capital Leasing Group, LLC* (2008) 166 Cal.App.4th 745, 752, fn. 2.)

TSP's reliance on this line of authority is misplaced. Based on his knowledge of the construction industry, Wightman testified the wavy line meant the handrails continued throughout the tunnel. Drawing on his own experience and expertise, La Fraugh opined the wavy line meant only the handrails continued for a short distance past the point shown on the drawing. Both experts were credible; the jury was entitled to resolve the conflict by accepting Wightman's view and not La Fraugh's. (*City of Hope National Medical Center v. Genentech, Inc., supra,* 43 Cal.4th at p. 395 ["Juries are not prohibited from interpreting contracts." "[W]hen, as here, ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the jury."]; see generally Evid. Code, § 805 ["[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact"].)

In addition to the testimony of its trial expert, MTA's interpretation of the B221 contract is supported by TSP's own predispute construction of the contract's plans and specifications. (See *City of Hope National Medical Center v. Genentech, Inc., supra*, 43 Cal.4th at p. 393 ["A party's conduct occurring between execution of the contract and a dispute about the meaning of the contract's terms may reveal what the parties

21

understood and intended those terms to mean. For this reason, evidence of such conduct . . . is admissible to resolve ambiguities in the contract's language."]; *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 753 ["'[t]he acts of the parties under the contract afford one of the most reliable means of arriving at their intention'"]; see also *Wolf v. Walt Disney Pictures & Television, supra,* 162 Cal.App.4th at pp. 1133-1134.) TSP's internal estimates, prepared prior to submitting its bid to MTA, included tunnel handrails as part of the B211 contract work; and its bid incorporated a $1 million component for metal manufacture that similarly anticipated installing handrails throughout the tunnel. Moreover, until it submitted its request for change order based on Allstar Steel's position it was not obligated to provide tunnel handrails under the modified subcontract, TSP's position was that tunnel handrails were required by the contract.

Under the familiar and highly deferential substantial evidence standard of review, the jury's implied findings the B221 contract required handrails throughout the tunnels and TSP's request for additional compensation was, therefore, a "false claim" within the meaning of the FCA must be affirmed. (See *Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1128; *Darling v. Caterpillar Tractor Co.* (1959) 171 Cal.App.2d 713, 721 ["the weight to be accorded to conflicting expert testimony is primarily a question for the trier of fact"].)

   c. *Substantial evidence supports the finding TSP was not misled by*
      *ambiguities in the B221 contract*

"A contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than as represented. [Citations.] This rule is mainly based on the theory that the furnishing of misleading plans and specification by the public body constitutes a breach of an implied warranty of their correctness." (*Souza & McCue Constr. Co. v. Superior Court* (1962) 57 Cal.2d 508, 510-511.) Based on this general principle, the jury was instructed, in language TSP helped craft, that TSP could not be liable for violating the FCA if it "was

22

misled and harmed because the B221 contract was ambiguous (that is, that it is susceptible of two different but reasonable interpretations) with respect to whether TSP was required to install handrails for the full length of the subway tunnel."

Even if its request for additional compensation was technically a false claim given the jury's interpretation of the B221 contract and related plans and specifications, TSP argues ambiguities in the contract plans caused it to omit the cost of installing handrails when it negotiated the subcontract with Allstar Steel. Accordingly, it contends, it did not knowingly submit a false claim in violation of the FCA. Once again, substantial evidence supports the jury's rejection of TSP's version of events.

As discussed, TSP's original metal fabrication subcontract with Jefco Benders included installation of handrails in the tunnels; and TSP's winning bid for the B221 contract did as well. Allstar Steel ultimately replaced Jefco Benders for a price that was lower than both its own original bid for the subcontract and Jefco Benders's bid, presumably because it covered fewer items than either of those two earlier bids. In fact, Allstar Steel informed TSP that a language change it had requested excluded any responsibility for installing tunnel handrails, which, although called for by MTA's plans when read as a whole, were not mandated by the specific drawings listed in Allstar Steel's subcontract.[12]

This disagreement between TSP and Allstar Steel as to whether installation of handrails throughout the tunnels was included within the subcontract was evidenced in a series of written communications between TSP and Allstar Steel after their subcontract had been executed. Nonetheless, following an August 1993 meeting between Allstar Steel's president, Mauricio Lopez, and TSP executives, Lopez agreed to assist TSP in requesting a change order and pursuing a claim for additional compensation on the

_____

[12] Lopez testified at trial he specifically asked Richard Sexton of TSP whether tunnel handrails were included before finalizing the subcontract because, based on his review of the drawings listed, they were not. According to Lopez, Sexton replied, "If they are not in your RFP [request for proposal], you don't have to worry about them. Somebody else is covering them."

23

ground Allstar Steel had missed handrails when it prepared its re-bid for the subcontract. A letter on Allstar Steel letterhead to that effect, signed by Lopez—and either prepared entirely by TSP with no input from him, according to Lopez; or simply with some assistance from TSP, according to it—was sent to TSP, dated October 21, 1993. That letter became the basis for TSP's request to MTA for an additional $116,758 to cover Allstar Steel's costs and its contractual 5 percent markup for installing the handrails. MTA rejected TSP's request, and TSP exercised its right under the contract for nonbinding resolution of the dispute by a DRB.

In its submission to the DRB TSP insisted "there is a clear ambiguity regarding any railings for the tunnels." The DRB was not told both TSP and Allstar Steel had previously agreed tunnel handrails were required by the B221 contract or that their earlier dispute had concerned whether the tunnel handrails were included in the scope of the re-bid subcontract, not whether the contract itself obligated TSP to install handrails; and the chronology of events leading to the October 21, 1993 letter was significantly distorted to avoid inquiries from MTA or the DRB regarding earlier exchanges on that topic. Similarly, TSP and Allstar Steel did not disclose Allstar Steel's original bid included the tunnel handrails they were now asserting were not part of the B221 contract. Indeed, to further support the claim TSP and Allstar Steel had bid the project on the assumption tunnel handrails were not included, TSP submitted a bid comparison sheet, subsequently found by the trial court to be "altered and falsified by TSP." Then, when the DRB requested from TSP a copy of the actual subcontract with Allstar Steel, TSP provided a modified version of the document that deleted one column of information, thereby eliminating all references to the specific sheets from the subcontract to be included in the scope of Allstar Steel's work. On May 24, 1994 the DRB ruled that tunnel handrails were not clearly shown in the B221 contract and that a change order should issue that would compensate TSP and Allstar Steel for the cost of furnishing and installing handrails.

At trial TSP attempted to justify its revised position concerning tunnel handrails through witnesses who testified Lopez had surprised the TSP officials at the August 1993 meeting by stating a detailed review of the B221 plans and specifications demonstrated tunnel handrails were not required and it was Lopez, not TSP personnel, who suggested the additional claim be presented. TSP then studied this analysis and, contrary to its original understanding of the plans and specifications, concluded, although the plans were unclear, they did not call for handrails in the tunnels. Lopez, in contrast, testified he always believed the plans, read as whole, called for tunnel handrails; it was Ron Tutor of TSP who suggested a letter be prepared on Allstar Steel stationery claiming the plans were ambiguous; and his so-called change in position was not sincere but rather the result of financial pressure from TSP.[13] According to Lopez, Tutor explained "at prime bid time they had the handrails covered but because of the mess with Jefco they had bungled the money and they didn't have money to cover that item of work anymore. So he wanted me to help him submit a claim to the MTA." Lopez also testified there was a subsequent meeting with TSP officials following preparation of the October 21, 1993 letter "to brainstorm and to prepare the claim." Asked directly, "So were you talking about [a] strategy for how to deceive the DRB," Lopez responded, "Yes."

TSP correctly asserts that a false statement or record within a true claim is not actionable under the FCA. (See former Gov. Code, § 12651, subd. (a)(2), Stats. 1987, ch. 1420, § 1, p. 5238; see also *U.S. ex rel. A+ Homecare v. Medshares Management* (6th Cir. 2005) 400 F.3d 428, 443; *U.S. v. Southland Management Corp.* (5th Cir. 2003) 326 F.3d 669, 675.)[14] Nonetheless, as discussed, substantial evidence supported the jury's implied finding TSP's claim for additional compensation for tunnel handrails was false

---

[13] Lopez testified he understood, if TSP was not successful in persuading MTA to provide additional compensation for the tunnel handrails, Allstar Steel would not be paid.

[14] "Given the lack of California authority and the very close similarity of California's act to the federal act, it is appropriate to turn to federal cases for guidance in interpreting the [FCA]." (*City of Pomona v. Superior Court* (2001) 89 Cal.App.4th 793, 802.)

(that is, tunnel handrails were included within the B221 contract). The jury was entitled to credit Lopez's testimony, not TSP's version of events, and to also conclude TSP knowingly made false statements to induce MTA to pay its false claim and was not misled by MTA's plans into inadvertently omitting the handrails from Allstar Steel's subcontract.

> d. *MTA was not barred from asserting TSP's tunnel handrail payment requests violated the FCA*

After the DRB ruled in TSP's favor based in substantial part on the false and deceptive materials TSP had submitted (as necessarily found by the jury), MTA accepted its nonbinding recommendation and issued a change order providing TSP with the additional compensation it had requested for the installation of tunnel handrails. TSP argues this change order amended MTA's contract with TSP and acknowledged the B221 contract's handrail requirements were ambiguous. Additionally, the execution of the change order, under the express terms of the parties' contract, constituted an accord and satisfaction of all claims relating to the issue in dispute. As a result, TSP contends, MTA was foreclosed from asserting TSP was not entitled to the additional funds MTA subsequently paid it.

To constitute a violation of the FCA, "the claim itself need not be false but only need be underpinned by fraud." (*City of Pomona v. Superior Court* (2001) 89 Cal.App.4th 793, 802.) Thus, a fraudulently induced contract may create liability under the FCA when that contract later results in payment by the government. (*Id.* at p. 803; see *U.S. ex rel. Marcus v. Hess* (1943) 317 U.S. 537, 543-544 [63 S.Ct. 379, 87 L.Ed. 443]; *In re Baycol Productions Litigation: United States ex rel. Simpson v. Bayer Healthcare* (8th Cir. 2013) 732 F.3d 869, 877-878 [claims for payment subsequently submitted under a government contract initially induced by fraud do not have to be false or fraudulent in and of themselves in order to state a cause of action under the federal False Claims Act].) An amendment to a contract—or even an accord and satisfaction—obtained by false and deceptive statements fares no better.

26

Similarly unpersuasive is TSP's contention that, by accepting the DRB's recommendation rather than serving a notice of intent to litigate within 21 days of receiving it, the DRB ruling became final and binding; and MTA was thereafter precluded from challenging it. TSP's argument rests on a false premise: MTA did not seek to overturn the DRB decision at trial. (Cf. *Los Angeles County Metropolitan Transportation Authority v. Shea-Kiewit-Kenny* (1997) 59 Cal.App.4th 676, 682-683 [explaining role of DRB in an MTA subway construction contract similar to B221; "the DRB is given the power to hear evidence and make recommendations—but no power to bind the parties to those recommendations. . . . The DRB members are facilitators or mediators, not adjudicators or arbitrators"].) Rather, it asserted (and proved to the satisfaction of the jury), TSP's and Allstar Steel's claim for additional compensation, the DRB decision and MTA's acceptance of the DRB ruling and issuance of the change order were all based in substantial part on TSP's knowing use of false and deceptive documents and testimony; indeed, as Lopez testified, deceiving the DRB was part of the plan from the outset. TSP's requests to be compensated for the work authorized by this improperly obtained change order were false claims within the meaning of the FCA. MTA's acquiescence in the DRB's decision, based on its state of knowledge at the time, was a product of TSP's unlawful scheme, not a validation of it. (Cf. *Pour Le Bebe, Inc. v. Guess? Inc.* (2003) 112 Cal.App.4th 810, 830, 832 (*Pour Le Bebe*) [discussing rule developed in federal cases evaluating postarbitration claims of fraud, whether extrinsic or intrinsic, based on whether the protesting party had an opportunity to discover and reveal the purported fraud at the arbitration hearing].)

> e. *TSP was not entitled to have the jury instructed MTA had a heightened burden of proof concerning any misconduct in connection with the DRB determination*

Citing *Pour Le Bebe, supra,* 112 Cal.App.4th 810 and two federal arbitration cases, TSP asked the trial court to instruct the jury MTA could not collaterally attack the DRB's conclusion TSP was entitled to a charge order absent "clear and convincing evidence" that TSP had made an intentional misstatement material to the DRB's

27

resolution of that issue. The trial court refused, concluding the instruction was contrary to law. The trial court was correct; *Pour Le Bebe* provides no support for TSP's demand for a heightened burden of proof of this issue.

In *Pour Le Bebe* our colleagues in Division Four of this court explained that, rather than relying on the distinction between intrinsic and extrinsic fraud, some federal courts had adopted a three-part test to determine whether an arbitration award should be vacated for fraud: "'First, the movant must establish the fraud by clear and convincing evidence. [Citations.] Second, the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration. [Citations.] Third, the person seeking to vacate the award must demonstrate that the fraud materially related to an issue in the arbitration.'" (*Pour Le Bebe, supra,* 112 Cal.App.4th at p. 830.) Ultimately, however, the *Pour Le Bebe* court did not apply the federal three-part test to the issue before it—whether the prevailing party had obtained the arbitration award by undue means as a result of its representation by conflicted counsel—reasoning that it was not always true that parties to an arbitration should not be given "a second bite at the apple" notwithstanding that the issue in question was raised in some fashion during the arbitration. The key, the court held, was whether the party had the opportunity to rebut or discover and reveal the purported fraud or undue means at the arbitration hearing. (*Id.* at pp. 832-833.)

Even were we to ignore the considerable difference between an arbitration award and the DRB recommendation in this case, therefore, *Pour Le Bebe* does nothing to disturb the established rule that the preponderance-of-the-evidence standard applies in civil fraud cases. (See *Liodas v. Sahadi* (1977) 19 Cal.3d 278, 291-293 [burden of proof in civil actions for fraud is preponderance of the evidence]; *The Grubb Co., Inc. v. Department of Real Estate* (2011) 194 Cal.App.4th 1494, 1503 ["[i]t is now clearly established that a verdict finding liability for fraud or misrepresentation—even knowing misrepresentation—need not be based on clear and convincing evidence, but only on a preponderance of the evidence"].) The same burden of proof applies to claims under the

28

FCA. (See Gov. Code, § 12654, subd. (c) [referring to FCA actions under Gov. Code, § 12652]; Evid. Code, § 115 ["[e]xcept as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence"]; see also *People ex rel. Allstate Insurance Co. v. Muhyeldin* (2003) 112 Cal.App.4th 604, 611 [explaining The Insurance Frauds Prevention Act (Ins. Code, § 1871 et seq.) was modeled after the federal False Claims Act, which since 1986 has provided that the burden of proof is by a preponderance of the evidence].)

      2. *TSP's Night Work Restriction Claim Was Properly Resolved at the <u>Cottle</u> Hearing*

As discussed, in granting nonsuit on TSP's night work restriction claim at a *Cottle* hearing, the trial court ruled the B221 contract only granted TSP a conditional right to work at night on the Wilshire/Normandie station and placed on TSP the risk of reductions in permissible noise levels for night work.[15] TSP does not directly challenge that interpretation of the B221 contract in its opening brief. (See *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1345, fn. 6 [failure to raise issue in opening brief waives it on appeal]; *Locke v. Warner Bros., Inc.* (1997) 57 Cal.App.4th 354, 368 [same].) Rather, it argues only that the trial court erred by disregarding extrinsic evidence supporting its contrary interpretation of the contract (that is, parol evidence it contends demonstrated the contract, in effect, assured TSP it would be able to perform night work).[16] TSP

---

[15] The B221 contract, in Paragraph 3.1 E., required TSP to "[p]erform Work in accordance with codes, ordinances, rules, regulations, orders and other legal requirements of governmental bodies and public agencies . . . .," and, in paragraph 3. 1 I., permitted night work if approved following presentation of "a written program outlining special precautions to be taken to control the extraordinary hazards presented by night Work . . . includ[ing] . . . noise limitations." Special provision 18 of the contract expressly required that any night work comply with the variance obtained from the Board of Police Commissioners, which stated it could be withdrawn if the noise level reached a point where substantial community complaints were registered or if construction noise exceeded permissible levels.

[16] In its reply brief TSP attempts to preserve a broader challenge to the trial court's interpretation of the contact's night restriction provision, insisting it had argued in the

additionally contends, even if the trial court's interpretation of the original contract language is correct, the B221 contract was effectively amended by the series of change orders MTA issued authorizing almost $3 million in additional payments for costs TSP had incurred because it was not able to perform night construction work. (See, e.g., *Frank T. Hickey, Inc. v. L.A. J.C. Council* (1954) 128 Cal.App.2d 676, 683 ["where [the contracting parties] agree on additional compensation for certain work it precludes a claim that the original contract requires the performance of such work"].) Those four change orders, TSP continues, expressly recognized the new night noise restrictions required TSP to perform work beyond that mandated by the original contract and obligated MTA to compensate TSP for all associated costs: "By amending the contract to permit additional compensation to build one part of the station, MTA implicitly agreed that the additional costs imposed by the night restrictions to build other parts of the station were not costs TSP would have to incur." Accordingly, the contract provisions relied upon by the trial court were superseded by the new change orders, entitling TSP to the $5 million MTA refused to authorize for additional costs in completing the box structure for the Wilshire/Normandie station. Neither argument has merit.

        a. *The trial court did not improperly disregard TSP's extrinsic evidence*

The extrinsic evidence proffered indicated MTA's project managers had initially agreed informally that TSP was entitled to additional compensation for the costs it incurred as a result of performing accelerated work during daylight hours following suspension of night work. In addition, TSP asserted the four change orders authorizing

---

briefs submitted at the *Cottle* hearings and in its opening appellate brief that the contract was susceptible to TSP's interpretation it had a right to work at night. Notably, however, although citing to the clerk's transcript to support its assertion with respect to its position in the trial court, TSP fails to identify where in the opening brief it disputed that interpretation on any basis other than the trial court's purported failure to consider the extrinsic evidence it had offered. Nor does TSP present any new or additional arguments in its reply brief. (See generally *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 ["[o]bvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant"].)

payment for those additional costs established the parties' predispute construction of their contract. (See *City of Hope National Medical Center v. Genentech, Inc., supra*, 43 Cal.4th at p. 393 [party's conduct between execution of contract and dispute about meaning of contract's terms may reveal what parties understood and intended terms to mean]; *Wolf v. Walt Disney Pictures & Television, supra,* 162 Cal.App.4th at pp. 1133-1134 [same]; see generally *Sterling v. Taylor* (2007) 40 Cal.4th 757, 772-773 ["[i]t is a 'cardinal rule of construction that when a contract is ambiguous or uncertain the practical construction placed upon it by the parties before any controversy arises as to its meaning affords one of the most reliable means of determining the intent of the parties'"].) The trial court considered, but rejected, that evidence as dispositive because the B221 contract precluded attaching any binding significance to statements or conduct by MTA's managers[17] and because the correspondence and statements, as well as the change orders themselves, were all prepared after the dispute first surfaced in September 1992 concerning the night work restrictions and TSP's right to additional compensation.

Although we question the trial court's first ground for discounting the extrinsic evidence—that an agent or employee is not authorized to amend or modify a contract does not mean his or her postexecution, predispute conduct cannot shed light on the parties' original intent and thus the proper interpretation of the contract's existing terms—the evidence here all concerned events after (i) the night noise level restrictions were modified, (ii) MTA had issued its night work suspension order, and (iii) TSP had proposed a change order authorizing premium pay rates for weekend labor because it could not perform slab-on-grade work with full street closures at night (what became change order 67). As the trial court concluded, based on *Warner Construction, supra*, 2 Cal.3d 285, those actions cannot properly be considered "predispute" within the

_____

[17] The contract provided, "Except as herein expressly provided [in connection with the formal change order process], no order, statement, or conduct of the Construction Manager, the Contracting Officer or any other person shall be treated as a change under the Contract or entitle the Contractor to an adjustment under the Contract."

meaning of the parol evidence cases. (See *id.* at p. 296 ["[t]he principle of 'practical construction' applies only to acts performed under the contract before any dispute has arisen"].) MTA's initial efforts to respond to TSP's change order demand and to deal equitably with its night work requests could not "constitute any 'practical construction' of the contract, in the absence of some conscious intention knowingly directed toward doing so." (*Grove v. Grove Valve & Regulator Co.* (1970) 4 Cal.App.3d 299, 310; see *Barnhart Aircraft, Inc. v. Preston* (1931) 212 Cal. 19, 24 ["[i]n determining the construction of the terms of a contract the acts and interpretation of the parties themselves to the contract have great weight with the courts in construing the intent of the parties, but such acts must be direct, positive and deliberate and must show that the acts were done in an attempted compliance with the terms of the contract or agreement"].)

In the *Warner Construction* case plaintiff contractor requested a change order authorizing an alternate method of constructing the project (use of "rotary mud") at an additional cost to the city of $12,000. The president of the city's board of public works sent a letter authorizing the change and stating the city would assume the additional cost. The board's secretary confirmed the president's statement in a separate communication, explaining a formal change order would be issued by the city engineer. Subsequently, however, the contractor discovered the additional work would cost more than $34,000, not $12,000 as estimated. In response, the city did not issue the change order at $12,000 and rejected the plaintiff's request for a change order in the larger amount. (*Warner Construction, supra,* 2 Cal.3d at p. 296.) In the litigation that followed, the trial court admitted the board president's and secretary's letters authorizing the alternate construction method and stating the city would assume the additional costs; the Supreme Court reversed, rejecting plaintiff's argument the initial communications were "predispute" because the parties were attempting to resolve the question through the contractually authorized change order procedure. (*Id*. at pp. 296-297.) The exchange of correspondence here mirrors exactly that in *Warner Construction*: TSP discovered the need for an alternate method of constructing the project, and representatives of MTA

initially authorized the change. As the Supreme Court held in *Warner Construction,* those communications were properly excluded by the trial court.

In addition, whether the correspondence, memoranda and change orders upon which TSP relies were prepared pre- or post-dispute, the evidentiary facts themselves are not in dispute. Accordingly, there was no issue for a jury to decide; and it remained entirely proper for the trial court to interpret the B221 agreement as part of the *Cottle* proceeding. (See *Wolf v. Walt Disney Pictures & Television, supra*, 162 Cal.App.4th at p. 1134 & fn. 18 ["[t]here was no 'conflict' in the evidence of Disney's predispute conduct, thus no factual issue for the jury to resolve"; although the parties vigorously contested the inferences to be drawn from Disney's predispute conduct, because the evidentiary facts themselves were not in dispute, "the trial court's admission of this evidence did not create any issue for the jury to resolve"].)

> b. *The earlier change orders did not require MTA to approve TSP's request for a change order authorizing more than $5 million in additional payments for the Wilshire/Normandie box structure*

TSP's second challenge to the trial court's grant of nonsuit—that the four earlier change orders for almost $3 million constituted amendments to the contract authorizing payment for more than $5 million of additional work on the Wilshire/Normandie station's box structure—fares no better. None of the change orders issued by MTA addressed the box structure, and each contained language contradicting TSP's position. Indeed, each provided, "Except as expressly provided herein, all terms and conditions of the Contract remain unchanged."

The initial change order (change order 67), which approved a payment of approximately $90,000 for additional labor costs relating to pouring the slab-on-grade concrete at the station, is identified as "mitigation," not an amendment to the contract, and expressly described the limited nature of the change authorized: "In order to comply with revised (reduced) maximum noise level constraints established by the Los Angeles Police Department (L.A.P.D.), and to utilize the only approved Los Angeles Department of Transportation (LADOT) time 'window' during which Wilshire Blvd. can be fully

33

closed, the Contractor is to provide the necessary labor, Subcontractors, and Suppliers (such as concrete batch plant services) to complete Saturday slab-on-grade (SOG) concrete placement for the Wilshire/Normandie Station. This Change covers only overtime premium costs for Saturday work, as well as weekday overtime premium cost for concrete placement preparation work, commencing 10/3/92 and continuing each Saturday until the SOG concrete placement operations for the Wilshire/Normandie Station are completed."

Change order 74 authorized TSP to hire a noise attenuation expert to consider how best to respond to the new noise level constraints; it did not address construction scheduling or authorize additional payments for increased construction costs. In addition, MTA only agreed to share the costs of the consulting expert, belying any claim this change order constituted a general approval for all additional costs that TSP might incur as a result of the night work restrictions.

Change order 134 dealt with $2.7 million in additional costs related to an approved revised work plan for the side structures, not the overall construction of the Wilshire/Normandie station. This change order also contemplated that night work might be possible notwithstanding the new noise level standards: "[TSP will p]erform the work of this change and associated efforts under the following conditions: [¶] 1. Comply with the present suspension of night work by LAPD-NET due to noise restraints and include no night shift work after 10:00 PM without prior approval. Exception: work at specific locations may be pursued where sound mitigation measures and/or physical location permit the work within acceptable noise levels."

Change order 165 was limited to modification of "some, but not all of the contractual requirements for deck removal and street resurfacing." (It authorized approximately $200,000 in additional costs.) In addition, the change order directed that the work be completed during the weekends of September 9, 1994 and September 16, 1994 "with full closure of Wilshire Boulevard and Ardmore Ave. (North) commencing at 7:00 P.M. on Friday and continuing until early Monday morning each weekend." That is,

far from implicitly authorizing payment to TSP for any and all aspects of its work on the Wilshire/Normandie station that could no longer be performed at night, change order 165 expressly authorized night work for the limited tasks it addressed.

In sum, even when considered together, these four changes orders do not support TSP's position that MTA impliedly agreed to pay additional costs for work not included in them and was required to approve a new $5 million change order for the box structure. Indeed, the fact TSP recognized it needed yet another change order is a tacit admission that the contract, even if "amended" to some extent by the earlier change orders, was insufficient to recover its additional box structure costs.  TSP was entitled to ask for the new change order; it was not a breach of contract for MTA to reject that request.  The trial court properly granted nonsuit in favor of MTA.

c. *This court accepts MTA's invitation to disregard its protective cross-appeal regarding TSP's night work restriction claims*

MTA contends change orders 67, 74, 134 and 165 were the product of TSP's knowingly false statements and representations to MTA and, alleging violations of the FCA and UCL as well as breach of contract, sought recovery of the almost $3 million it had paid to TSP pursuant to those change orders.  MTA's theory was the B221 contract imposed on TSP the risk of any reduction in permissible construction noise levels and consequent impact on its ability to perform night work—the construction of the contract adopted by the trial court—and, therefore, TSP's claims for additional payments as a result of the night work restrictions were "false" within the meaning of the FCA:  TSP attributed additional costs to the night work restrictions that were, or should have been, included in its original bid.  MTA also asserted TSP acted knowingly (that is, with the requisite scienter) in submitting those false claims as evidenced, in part, by false statements TSP made to MTA concerning how and when it had originally planned to perform work covered by the change orders (for example, that its bid day plan was to perform the slab-on-grade work at night).  In addition, according to MTA, TSP did not originally bid the contract planning to perform certain work at night because it knew the

35

variance permitting night work could be modified or withdrawn; yet TSP successfully concealed this fact notwithstanding MTA's request to provide the original bid documents.

The trial court granted nonsuit in favor of TSP on MTA's claims, finding as a matter of law the claims submitted by TSP were not knowingly false: "Although this court disagrees with TSP's construction of the Contract with respect to night noise restrictions, the court also finds, as a matter of law, that TSP's interpretation is not so frivolous as to meet the scienter requirement of the False Claims Act." The court further granted nonsuit on the UCL and breach of contract claims on the assumption those claims were dependent on FCA liability.

In what they expressly label a protective cross-appeal MTA and the State argue the trial court erred in granting nonsuit on these claims in a *Cottle* proceeding, asserting there was sufficient evidence to establish a prima facie case the claims were false and TSP knowingly made material,[18] false statements in support of those claims. Nonetheless, recognizing the economic realities of continued pursuit of this 20-year-old litigation, in the concluding paragraphs of their cross-appellants' reply brief, MTA and the State declare they will be satisfied if this court's decision on the issues before it concludes the litigation and disclaim any interest in a reversal of that nonsuit ruling unless we also reverse the rulings against TSP and remand the case for a further trial. Given our affirmance of the trial court's determination against TSP on its night restriction claim, we accept that invitation and affirm the corresponding nonsuit ruling against MTA as well.

---

[18] The trial court found the B221 noise level and night restriction provisions unambiguous and ruled TSP's false statements could only be material under the FCA if the contract was ambiguous.

3. *The Trial Court Did Not Abuse Its Discretion in Imposing Issue Sanctions Barring TSP's Street Restoration and Project Completion Delay Claims*

TSP concedes it did not produce "master" or "interface" scheduling data or the hard drives containing that information despite several discovery orders directing it to do so and that, sometime after allowing its own expert access to its computers and the scheduling information on the hard drives, it destroyed those hard drives. Nonetheless, TSP argues the trial court improperly imposed issue sanctions for its discovery violations that precluded its street restoration and project completion delay claims in their entirety because it had not received proper notice of the intended sanctions, MTA failed to present evidence regarding the significance of the missing data to the delay claims and the sanctions were overbroad. None of these contentions warrants reversal of the sanctions order.[19]

In October 2006, shortly after the case was remanded following *TSP I*, the trial court denied without prejudice MTA's omnibus motion to confirm the continued validity of all prior sanctions orders that had not been reversed on appeal, which included the court's order precluding TSP's expert from offering any testimony derived from the missing hard drives. Nearly three years later, in August 2009, MTA moved in limine to exclude, not just expert testimony, but "any and all statements, evidence, argument, opinions and/or testimony based upon, derived from or related to the B221 construction schedule or scheduling information ('Scheduling Data')." The motion stated it was based on the ground TSP had "withheld this information from the MTA, in violation of numerous court orders and discovery referee recommendations, and then subsequently destroyed the computer hard drives containing all of that Scheduling Data. But, before doing so, it provided that data to its own expert, while refusing and/or failing to make that

---

[19]    We review the trial court's sanctions order under the deferential abuse of discretion standard. (*Ellis v. Toshiba America Information Systems, Inc*. (2013) 218 Cal.App.4th 853, 878; *Diepenbrock v. Brown* (2012) 208 Cal.App.4th 743, 747.) We resolve any evidentiary conflicts most favorably to the trial court's ruling. (*Ellis*, at p. 878.)

same data available to the MTA." After several rounds of briefing and two hearings (on October 1 and November 23, 2009), the trial court granted the motion on December 11, 2009, ruling TSP could not offer "any testimony, lay or opinion, or documentary evidence which is derived from or relies in whole or in part on the primavera computer hard drive, including disks or documents derived (at any time) from said hard drive."

Prior to the sanctions ruling, TSP had in various filings asserted the scheduling evidence was essential to proving its delay claims. Responding to that ruling, however, TSP stated it could establish its delay claims through evidence that was not dependent on schedule-based information. In late December 2009 MTA moved in limine to preclude that evidence and argument, contending they were barred by the B221 contract itself (that is, that delay claims had to be based on scheduling impact) and would be unfair and prejudicial. A hearing was held in January 2010 at which the court expressed doubt about TSP's ability to prove its delay claims without scheduling information. A further hearing pursuant to Evidence Code section 402 was held on March 15, 2010 at which TSP was directed to have its expert present to allow the court to determine if TSP could establish its delay claims without the excluded schedule-based information.

After hearing testimony the court concluded "MTA's ability to challenge TSP's analysis (that is, to offer evidence that impeaches or contradicts TSP's delay theories) is substantially impaired by MTA's inability to access TSP's contemporaneous records concerning project schedule and critical path (due to TSP's discovery violation)." Accordingly, the court on March 18, 2010 entered its issue-sanctions order, explaining, in the language quoted above, it perhaps should have done so earlier in the litigation.[20] TSP's subsequent motion to reopen the Evidence Code section 402 hearing was denied.

_____

[20] The court subsequently observed, "There had been briefing and rebriefing of MTA's motion for issue and for evidence sanctions. The court could have made the decision that was issued in the March 18 order based on the initial briefing in the initial motion. And instead the court gave TSP more opportunities to be heard, including rebriefing and reargument and an opportunity to present live evidence in a 402 hearing. And that does not constitute a deprivation of due process."

38

Although the trial court's directives to the parties concerning the March 15, 2010 hearing may not have expressly indicated the court was considering imposition of an issue or claim preclusion sanction, that possibility had been addressed throughout the ongoing, postremand briefing and hearings regarding the appropriate remedy for TSP's discovery violations. Indeed, the court recognized that point in explaining its ruling, "We've had argument on that point previously because the MTA previously asked for it to be an issue sanction rather than an evidence sanction." Unlike the sanctions order we reversed in *TSP I*, TSP had adequate notice and sufficient time to respond to the factual allegations underlying the charge of discovery abuse—which had not varied throughout the many years of hearings—as well as to MTA's claims of prejudice resulting from its inability to access the missing hard drives. (Cf. *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 652 ["[c]onstitutional due process principles are offended by the summary imposition of sanctions . . ."].)[21]

Understandably, TSP does not contend it was error to impose any sanction at all for its admitted discovery violations; it tacitly admits the evidentiary sanctions ordered prior to March 18, 2010 were a proper response to its repeated disobedience of court orders to provide MTA with the hard disks containing "master" or "interface" scheduling data. Based on the extensive record before the trial court and the court's familiarity with both the issues and the parties' positions, we similarly conclude its finding MTA's defense would be unfairly prejudiced by the absence of those data was amply justified and the issues sanction ultimately imposed well within its broad discretion. The trial court was not attempting to punish TSP but simply "to prevent abuse of the discovery

---

[21] The trial court's limitation of TSP's evidentiary presentation during the March 15, 2010 hearing was well within its broad discretion to control its own proceedings. In any event, as MTA argues, in its motion to reopen that hearing, TSP presented all the evidence it had intended to introduce. In denying the motion to reopen, the trial court stated, "If the court considered evidence that is included in the current motion, there is no relevant new evidence. And the court would reach the same result as in the March 18, 2010 order."

process and correct the problem presented." (*McGinty v. Superior Court* (1994) 26 Cal.App.4th 204, 210.) "Where a party has refused to supply information relevant to a particular claim, an order precluding the claim is an appropriate sanction." (*Sauer v. Superior Court* (1987) 195 Cal.App.3d 213, 228; accord, *Kuhns v. State of California* (1992) 8 Cal.App.4th 982, 989 ["[a]ppellant's having failed to produce information relevant to respondents' claim of the dangerous condition of the property and appellant's notice thereof, it was appropriate for the court to impose an issue sanction deeming those matters admitted"].)

Although, as TSP emphasizes, MTA did not present expert testimony to explain how the missing data might have aided its defense of the street restoration and project completion delay claims, no such burden is properly placed on MTA. In *Electronic Funds Solutions, LLC v. Murphy* (2005) 134 Cal.App.4th 1161, 1184, the court observed defendants' intentional destruction of data on computer hard drives in violation of outstanding discovery orders made it virtually impossible to determine what was destroyed. The court rejected the argument a showing of prejudice from the deletion of the data was necessary to support terminating sanctions because "defendants' own actions make that showing difficult, if not impossible." (*Ibid*.) The same is true here; as the trial court reasoned, MTA is not required to prove a negative. (See *generally Kayne v. The Grande Holdings Limited* (2011) 198 Cal.App.4th 1470, 1474 ["[o]nly two facts are absolutely prerequisite to imposition of the sanction: (1) there must be a failure to comply [with a valid discovery order] . . . and (2) the failure must be willful"; internal quotation marks and citations omitted]; *Biles v. Exxon Mobil Corp*. (2004) 124 Cal.App.4th 1315, 1327 [same].)

4. *The Trial Court Erred in Permitting the State To Substitute as a Party on the UCL Claim Following* <u>*TSP I*</u>

In *TSP I* we not only held MTA lacked standing to sue under the UCL because it is not a "person" within the meaning of the statute (see, e.g., *Santa Monica Rent Control Bd. v. Bluvshtein* (1991) 230 Cal.App.3d 308, 318; see also *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1203 [collecting appellate cases holding government

entities are not "persons" under the UCL]) and because only authorized prosecutors suing in the name of the People may recover civil penalties under Business and Professions Code section 17206, but also directed "[o]n remand judgment on the UCL claims is to be entered in favor of TSP." Notwithstanding that express mandate, the trial court on remand maintained the UCL claims against TSP, granting MTA's motion to substitute the State as the party asserting those claims.

Code of Civil Procedure section 473 (section 473) authorizes the trial court "in furtherance of justice, and on any terms as may be proper, [to] allow a party to amend any pleading or proceeding by adding or striking out the name of any party . . . ." (§ 473, subd. (a)(1).) This provision has been liberally construed to permit amendment to substitute a plaintiff with standing for one who is not a real party in interest. (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 243 ["courts have permitted plaintiffs who have been determined to lack standing, or who lost standing after the complaint was filed, to substitute as plaintiffs the true real parties in interest"]; see *Klopstock v. Superior Court* (1941) 17 Cal.2d 13, 19-21; *California Air Resources Bd. v. Hart* (1993) 21 Cal.App.4th 289, 300.) The Supreme Court in *Branick,* which considered the injury-in-fact requirement added to the UCL by Proposition 64, explained, "Leave to amend a complaint is thus entrusted to the sound discretion of the trial court. . . . [T]he discretion to be exercised is that of the trial court, not that of the reviewing court. Thus, even if the reviewing court might have ruled otherwise in the first instance, the trial court's order will yet not be reversed unless, as a matter of law, it is not supported by the record." (*Branick*, at p. 242; italics and internal quotation marks omitted.)

The issue before us, however, is not whether the trial court abused its discretion under section 473 in permitting MTA to substitute the State as the party asserting the UCL claims, but whether it had any discretion to do so in light of the clear direction in *TSP I* to enter judgment on those claims in favor of TSP. It did not. "'The order of the appellate court as stated in the remittitur, "is decisive of the character of the judgment to which the appellant is entitled. The lower court cannot reopen the case on the facts,

41

allow the filing of amended or supplemental pleadings, nor retry the case, and if it should do so, the judgment rendered thereon would be void.""" (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 701.) "The trial court is empowered to act only in accordance with the direction of the reviewing court; action which does not conform to those directions is void." (*Hampton v. Superior Court* (1952) 38 Cal.2d 652, 655; accord, *Ayyad v. Sprint Spectrum, L.P.* (2012) 210 Cal.App.4th 851, 859.)

MTA attempts to justify the trial court's action by asserting, because *TSP I* anticipated the litigation between TSP and MTA would continue on other issues, MTA's motion to amend its cross-complaint "was entirely distinct from this Court's directive to enter judgment against the MTA and in favor of TSP on the UCL claim, which the trial court unquestionably followed." MTA's argument fundamentally misapprehends the significance of our opinion on this issue and our order to the trial court. By directing entry of judgment "in favor of TSP," we intended an end to the UCL claims asserted in the cross-complaint, not a new beginning by a different party. To be sure, in explaining that MTA lacked standing, we also observed the claims it asserted "could have been the subject of a public enforcement action filed by an authorized prosecutor in the name of the People of the State of California." But our use of the past tense in that sentence (actually, past perfect) was neither accidental nor meaningless.[22] Our description of how the UCL claims should have been filed was not an invitation for a do-over. The trial court was obligated to enter judgment on those claims in favor of TSP immediately upon remand, not five years later. Once judgment was entered, those claims would no longer

---

[22]    After citing the case law holding governmental entities may neither sue nor be sued as a "person" under the UCL, we noted those agencies are not without protection if victimized by unfair business practices: "[A]n action for injunctive relief and restitution, as well as to recover civil money penalties, may be prosecuted on [MTA's] behalf by the district attorney in the name of the People of the State of California." (*TSP I*, at fn. 14.) Nothing in that footnote generally describing the relevant UCL provisions authorized the trial court to disregard our order to enter judgment in favor of TSP and to revive the UCL claims here by granting MTA's motion to add the State as a party.

exist; and any attempt to substitute parties asserting them under section 473 should have been rejected.

5. *The Trial Court Properly Denied Attorney Fees to TSP but Erred in Denying Fees to the Sureties*

a. *The trial court's award of attorney fees against TSP and the Sureties following the first trial*

The three Metro Red Line contracts at issue in this litigation (B211, B221 and B231) required TSP to obtain a construction performance bond guaranteeing TSP's faithful performance of the contract. Each performance bond contained an attorney fee provision with identical language: "In case suit is brought upon this bond, Surety will pay reasonable attorneys' fees to [MTA] in an amount to be fixed by the court." The MTA-TSP contracts, in contrast, did not have attorney fee provisions.

Although MTA's 1999 cross-complaint asserted claims for breach of contract and violations of the FCA and UCL involving the B211, B221 and B231 contracts, the Sureties were named as cross-defendants only in a separate cause of action involving the B221 bond, which asserted TSP and the Sureties were liable for liquidated damages because TSP had not finished certain work by contractually mandated milestone dates (ultimately quantified as approximately $136,000) and that the Sureties were liable under the bond to the extent other contractors had been required to redo TSP's work. MTA sought to recover attorney fees based on this cause of action from the Sureties (but not TSP): "The MTA has been forced to retain the undersigned firm of attorneys in collection of this matter and has and will continue to incur attorneys' fees as a result of the breach of contract by the TSP CROSS-DEFENDANTS [TSP and the Sureties]. Such fees are recoverable from SURETY pursuant to the bond."

Notwithstanding the limited nature of the outstanding claim against the Sureties, which involved only the B221 contract, after the mid-trial evidence, issue and terminating sanctions orders were imposed, the trial court ruled the Sureties were liable under their bonds for all claims MTA had asserted against TSP under all three contracts. As described in *TSP I*, the court instructed the jury MTA had introduced prima facie

43

evidence to support each of its claims and directed it to award damages on each of the claims. The jury found TSP and the Sureties jointly and severally liable for $17.9 million in damages and penalties and TSP liable for an additional $11.5 million under the UCL for disgorgement of profits unfairly obtained.

In postjudgment proceedings the court then awarded MTA $21.7 million in attorney fees it had incurred in litigating its affirmative claims and defending against TSP's claims (using the lodestar approach and a multiplier of two). The award, made jointly and severally against both TSP and the Sureties, was predicated in part on the court's finding, "The construction contracts and the performance bonds constitute a single integrated contact. All of the attorney fees incurred by the attorneys herein flow from breaches of these contracts." The court also ruled TSP and the Surety's request for attorney fees in their answer to the cross-complaint estopped them from challenging MTA's entitlement to fees and an award of attorney fees to MTA was authorized by the FCA and the private attorney general doctrine.[23]

Both TSP and the Sureties appealed the award of fees. As we noted in *TSP I*, because we reversed the underlying judgment (based on inadequate notice regarding the terminating sanctions imposed), issues involving the fee award were moot.

---

[23] The March 25, 2002 minute order granting MTA's motion for attorney fees suggests the ruling was heavily influenced by Judge Kalin's perception TSP had engaged in egregious misconduct during the litigation: "TSP during discovery concealed and destroyed documents causing a prolongation of the discovery process and requiring numerous discovery motions to be filed and heard. The discovery process extended for months requiring the expenditure of large sums of litigation expenses and attorneys' time. [¶] MTA accused TSP of being litigious, using aggressive tactics, engaging in unsavory litigation practices and reprehensible conduct. [¶] As a result of these accusations and after many hearings and motions the court imposed substantial monetary sanctions and eventually evidentiary sanctions against TSP. [¶] The MTA is entitled to attorney fees to be assessed against the cross-defendant herein." Only after this prologue did the court describe the several alternate bases for the award of attorney fees discussed in the text.

b. *Proceedings on remand with respect to the B211 and B231 contracts*

After the case was remanded, in addition to seeking leave to substitute the State as the party asserting the UCL claims, MTA sought leave to amend its cross-complaint, "as previously approved and ordered by Judge Kalin to conform to proof, [to] formally identify the existing cross-defendant sureties" as cross-defendants on all causes of action relating to the B211 and B231 contracts. The court denied this part of MTA's motion, explaining, "There, I think, has been an insufficient showing that what happened at trial provided new facts that could not have been discovered previously. It appears to me that adding the two new contracts obviously prejudices the Sureties because they don't have an opportunity for discovery with respect to the defense the Sureties might have with respect to those contracts." Although its request to amend was denied, counsel for MTA indicated a separate lawsuit on the bonds for the B211 and B231 contracts might be filed. The court responded, "If you file a separate action, let us know. . . . I would assume that the Sureties are going to argue that it doesn't relate back because there's a statute of limitations issue. And if they make that argument, we'll just tee it up and get to it."[24] No separate action was ever filed.

c. *Proceedings on remand affecting the Sureties' potential liability on the B221 contract*

On March 15, 2010, after the tunnel handrail trial and various *Cottle* hearings, MTA filed a statement to the court regarding resolved claims, agreeing to have judgment taken against it on four of TSP's contract claims totaling slightly more than $550,000, subject to any offsetting claims in favor of MTA and against TSP.

On May 3, 2010 TSP and the Sureties filed motion in limine 36, which sought in part to preclude testimony or argument seeking to establish liability against the Sureties for liquidated damages based on TSP's delay in completing portions of the B221 project. TSP and the Sureties argued, regardless of the outcome on the outstanding issues

---

[24] The court also denied MTA's request to add a new fraud cause of action against TSP.

45

remaining to be tried, in light of the prior determinations in the lawsuit, MTA would owe TSP more in claims than it could establish against TSP, such that there would be no payment obligation TSP could breach and, therefore, no TSP obligation for the Sureties to underwrite. (TSP and the Sureties excepted from this analysis any FCA penalties or trebling of damages, which they asserted could not be obligations imposed against TSP's performance bond.) In addition, they contended, MTA held TSP funds as a retention in a sum that far exceeded the maximum amount recoverable under MTA's liquidated damages claim ($136,000). According to TSP and the Sureties, the Sureties were entitled to the benefit of that retention prior to being held liable to MTA. "Consequently, MTA cannot establish any damages against the Sureties on the Liquidated Damages Claim, and the Sureties should be dismissed from this case."

When TSP and the Sureties filed motion in limine 36, a stay imposed by the trial court on additional motion practice was in effect. Although that stay was not due to expire until early September 2010, shortly before the continued trial date, TSP and the Sureties argued their motion fell within an exception and should be heard. The court rejected that argument but indicated the motion could be considered before the start of trial. Because of subsequent events, the motion was never heard.

On September 2, 2010, before the stay of proceedings ended, MTA and the State filed a notice of withdrawal of claims, eliminating a remaining quality control claim and the claim for liquidated damages for failure to meet a contractually imposed milestone, as well as the State's UCL disgorgement damage claims. MTA asserted the withdrawal of these claims "is for judicial efficiency and is not an admission of any liability."

On September 13, 2010 MTA filed a Notice of Disposition of Remaining Claims withdrawing its remaining affirmative claims, agreeing to have judgment entered against it on TSP's two outstanding contract claims in the amounts then asserted as due by TSP (totaling slightly more than $1.1 million), and explaining "said actions are for judicial efficiency and are not admissions of liability." MTA further stated, "With effectuation of the actions contemplated herein, there are no additional matters to be heard or tried by

46

this court and/or the Jury." Accordingly, while reserving its rights to appeal, MTA requested that the court vacate the upcoming motion hearing and trial date, establish a briefing and hearing schedule for posttrial, prejudgment interest motions and enter judgment on the matters previously adjudicated or otherwise resolved.

At a hearing on September 14, 2010 counsel for MTA confirmed the trial date should be vacated and judgment entered. The parties agreed the issue of prejudgment interest needed to be resolved and there was one outstanding motion regarding the production of scheduling documents TPS asserted it needed to make a complete offer of proof for purpose of an appellate challenge to the court's order imposing issue and claim preclusion sanctions. Nomi Castle, representing TPS and the Sureties, then commented there might be posttrial motions: "I know for sure that we will have a cost bill, an attorneys' fees motion, and there may be other post-trial motions as appropriate, although none come to mind right now that we are planning to bring." The court commented, "I hear the word 'attorneys' fees,'" it strikes fear into my heart." Ms. Castle responded, "Not TSP attorneys fees." MTA's counsel then said, "We are not surprised to hear that. We are strongly in disagreement that TSP would be entitled to claim or recover attorneys' fees. However, we realize that we can't stop them from filing such a motion. Relative to the interest . . . ." The court interrupted at this point, "I'm sorry. Just a minute. Ms. Castle, you said 'not TSP attorneys' fees'?" Ms. Castle answered, "I mean, there may be . . . . We are going to bring an attorneys' fees motion with respect to the sureties, and we will have a cost bill. And I have notified the MTA of our intent to seek attorneys' fees on behalf of the surety for some time now and even recently." The court ended the discussion by stating, "Okay. On behalf of the surety, Okay."

In mid-October 2010 MTA filed two requests for dismissal without prejudice: one directed to the third cause of action in its first amended cross-complaint (to enforce the public works bond on the B221 contract); the second to all claims against several of the sureties. In mid-November 2010 a third request for dismissal without prejudice was filed

47

as to the remaining cross-defendant sureties.  The requested dismissals were apparently entered on December 3, 2010.

> d. *The motions for attorney fees*

In early February 2011 the parties stipulated to continue the date for filing any motions for attorney fees until the time for filing motions or related papers directed to all other matters to be included in the judgment entered in the case.  The Sureties and MTA also agreed to brief first the question whether the Sureties were entitled to fees and thereafter the amount of fees (if any) that should be recovered.

The court entered judgment on February 9, 2011, expressly providing, "The amount and entitlement to costs and attorneys' fees, if any, shall be added to this Judgment pursuant to post-judgment proceedings."  On April 15, 2011 the Sureties and TSP jointly moved for attorney fees as prevailing parties "in the amount of $21,602,638.00, subject to future adjustment under the lodestar method, or alternatively, in other lesser amounts as may be permitted and reasonably apportioned for the Sureties and/or for TSP" in accordance with the various theories of entitlement advanced.  The Sureties sought recovery as prevailing party on the MTA's actions on each of the three bonds (that is, the bonds for the B211, B221 and B231 contracts) and also separately moved to strike MTA's dismissals of certain claims to forestall the argument that those dismissals precluded recovery of attorney fees under section 1717, subdivision (b)(2).  TSP sought its fees only with respect to the B211 and the B231 contracts, asserting it had prevailed on several of its affirmative claims on those two construction contracts and had defeated all of MTA's claims on those contracts and the corresponding performance bonds.

The court denied TSP's and the Sureties' motion for an award of attorney fees and the Sureties' motion to strike MTA's dismissal of claims.[25] The court found the effort to strike the dismissals was procedurally improper and too late: The dismissals had been entered and the judgment signed prior to the filing of the motion.

With respect to the Sureties, the court explained under section 1717, subdivision (b)(2), a dismissal precludes recoveru of attorney fees even if it occurs late in the litigation. Accordingly, as to the claim under the performance bond for the B221 contract, the Sureties were not entitled to attorney fees. With respect to the bonds for the B211 and B231 contracts, the court concluded the Sureties were not the prevailing parties "on contract claims that never were asserted against them in this litigation, as a matter of pleading, but on which judgment was entered in the 2001 trial and then reversed on appeal" on two grounds: First, MTA gave up its right to pursue those claims by virtue of its voluntary dismissal. Second, given that this court had ordered all parties to bear their own costs in connection with the first appeal, rather than awarding the Sureties their costs, and the Sureties were not subjected to further litigation with respect to the B211 and B231 contracts after remand, in the exercise of its discretion, the court determined they did not prevail on those claims. The court also ruled the Sureties were not entitled to attorney fees under the FCA because MTA's claims were not completely without merit or pursued for the primary purpose of harassment.

---

[25] In its September 15, 2011 opinion and order the court explained, although TSP had prevailed in the lawsuit with respect to net monetary relief, MTA had also obtained relief against TSP by virtue of the determination TSP violated the FCA, "considering the potential collateral consequences of that determination." Accordingly, citing *Hsu v. Abbara* (1995) 9 Cal.4th 863, 877, the court exercised its discretion under Code of Civil Procedure section 1032, subdivision (a)(4), and determined TSP and MTA should each bear its own costs. The court found the Sureties, who were not subject to the adverse FCA verdict, were prevailing parties for purposes of Code of Civil Procedure section 1032, subdivision (a)(4), but limited their recovery to costs incurred that were not for the joint benefit of TSP and the Sureties. No party has appealed from these costs determinations.

49

As to TSP, the court rejected its argument it should recover its own attorney fees based on the fee provision in the performance bonds (the same argument MTA had used to recover fees following the first trial). First, the court ruled, whatever rights TSP may have under the bonds, they can be no greater than the Sureties'. Because the Sureties were not entitled to recover fees, neither was TSP. Second, the performance bonds were not incorporated by reference into the B-series contracts between MTA and TSP. Because MTA had no contractual right to recover attorney fees against TSP, under either the performance bond or any other contract, TSP had no right to recover attorney fees against MTA pursuant to section 1717. Finally, the court held MTA was not judicially estopped to oppose TSP's demand for attorney fees based on its earlier argument, accepted by Judge Kalin following the first trial, that the performance bonds entitled MTA to recovery of fees from TSP. Because MTA ultimately did not benefit from its argument concerning integration of the construction contracts and performance bonds (as a result of the reversal in *TSP I*), MTA could withdraw that argument, "which this court [Judge Kuhl] determines to be completely wrong."

e. *TSP is not entitled to recover attorney fees*[26]

Section 1717, subdivision (a), authorizes the trial court to award reasonable attorney fees to the prevailing party in a contract action if the contract specifically

---

[26] An order granting or denying an award of attorney fees is generally reviewed for abuse of discretion. (See, e.g., *Ajaxo Inc. v. E*Trade Group, Inc.* (2005) 135 Cal.App.4th 21, 58 ["A trial court is given wide discretion in determining which party has prevailed on a contract. We will not disturb such a determination on appeal absent a clear abuse of discretion."]; *McLarand, Vasquez & Partners, Inc. v. Downey Savings & Loan Assn.* (1991) 231 Cal.App.3d 1450, 1456 [no abuse of discretion where trial court "apparently concluded that fairness dictated each side should pay its own attorneys' fees"].) Questions of statutory interpretation, however, are questions of law subject to our independent or de novo review. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432; *California Veterinary Medical Assn. v. City of West Hollywood* (2007) 152 Cal.App.4th 536, 546.) In addition, we independently determine as a question of law the scope of an attorney fee provision when the interpretation does not turn on extrinsic evidence. (*Kalai v. Gray* (2003) 109 Cal.App.4th 768, 777; *Exxess Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698, 705.)

provides for an award of such fees. To ensure mutuality of remedy, section 1717 makes an attorney fee provision reciprocal even if it would otherwise be unilateral either by its terms or in its effect. (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 610; *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 128.)[27]

"[T]he party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract." (§ 1717, subd. (b)(1).) Section 1717, subdivision (b)(1), also authorizes the trial court to "determine that there is no party prevailing on the contract for purposes of this section." "[I]n deciding whether there is a 'party prevailing on the contract,' the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources. The prevailing party determination is to be made only upon final resolution of the contract claims and only by 'a comparison of the extent to which each party ha[s] succeeded or failed to succeed in its contentions.'" (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876.)

TSP acknowledges that the B211 and B231 contracts do not contain attorney fee provisions and does not challenge the trial court's conclusion the fee provisions in the performance bonds were not expressly incorporated into the B-series contracts or otherwise applicable because part of a single integrated contract, as found by Judge Kalin following the initial trial. Nonetheless, TSP contends it is entitled to recover attorney fees pursuant to section 1717 as the prevailing party on the contract claims relating to the B211 and B231 contracts under a theory of either judicial estoppel or reciprocity because

---

[27] Section 1717, subdivision (a), provides: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs. [¶] . . . [¶] Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit."

MTA had argued TSP was liable for those fees following its victory in the first trial. Neither contention has merit.

"""Judicial estoppel precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position. [Citations.] The doctrine's dual goals are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies. [Citation.] Application of the doctrine is discretionary."' [Citation.] The doctrine applies when '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.'" (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986-987; accord, *People v. Castillo* (2010) 49 Cal.4th 145, 155; *Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 943.)

Although TSP concedes judicial estoppel requires that the party to be estopped has been successful in asserting the first position (*Aguilar v. Lerner, supra*, 32 Cal.4th at p. 986; *Phillips v. Sprint PCS* (2012) 209 Cal.App.4th 758, 767), it maintains the doctrine may apply when, as here, a litigant's initial success has been reversed on appeal, citing as the sole basis for this proposition *Jones v. Union Bank of California* (2005) 127 Cal.App.4th 542. In *Jones* borrowers had initially prevailed in an action against Union Bank of California to set aside a foreclosure sale and were awarded their attorney fees. The initial judgment was reversed on appeal; following remand, the bank prevailed and was awarded its attorney fees. In the second appeal the appellate court rejected the borrowers' principal argument an award of fees was precluded by antideficiency legislation and also held the fee provision at issue was broad enough to include actions based on tort, as well as contract claims. The court then observed, "In any event, Borrowers' prior successful motion for attorney fees in the same action estops them from claiming Bank has no right to the fees." (*Id*. at p. 549.)

Whether properly characterized as dicta or alternate holding,[28] we are not persuaded by this single sentence to expand the third requirement for judicial estoppel to include only short-lived or temporary success or to disregard the Supreme Court's explanation in *Aguilar v. Lerner*, *supra*, 32 Cal.4th 974, quoted two paragraphs above, that the doctrine is intended to prevent a litigant from obtaining an advantage by taking one position and then seeking a second advantage from an inconsistent position. Here, MTA gained no advantage by persuading the trial court to award attorney fees against TSP based, in part, on a theory the B-series contracts and the performance bonds were "integrated" and thus the attorney fees provisions from the latter should be included in the former. The ruling based on that theory, which Judge Kuhl aptly described as "completely wrong," was necessarily vacated when we reversed the judgment in favor of MTA in *TSP I*.

More useful than the abbreviated discussion of judicial estoppel in *Jones v. Union Bank of California*, *supra*, 127 Cal.App.4th 542, is that court's citation to *M. Perez Co., Inc. v. Base Camp Condominiums Assn. No. One* (2003) 111 Cal.App.4th 456 (*Perez*) in which our colleagues in the Third District disapproved language in their earlier decision *International Billing Services, Inc. v. Emigh* (2000) 84 Cal.App.4th 1175 that echoed the argument advanced by TSP in this court: "*International Billing Services* relied on the doctrine of judicial estoppel to reach the conclusion that a party claiming attorney fees is later estopped from denying an attorney fee provision. . . . [¶] In *International Billing Services*, we paid little heed to the third requirement [that the party was successful in asserting the first position] . . . . [¶] . . . Where a litigant is uncertain that a contractual provision allows a recovery of attorney fees, it is not improper to assert a claim based on that provision, just as it is not improper for the opponent to claim the provision does not allow such recovery. But those parties should not be estopped thereafter to assert

---

[28] Even if a holding, of course, we are not obligated to follow a decision by the Court of Appeal with which we disagree. (See *Jessen v. Mentor Corp.* (2008) 158 Cal.App.4th 1480, 1490, fn. 10 [there is no "'horizontal stare decisis' in the Court of Appeal"]; *In re Marriage of Shaban* (2001) 88 Cal.App.4th 398, 409 [same].)

contrary positions if their interests become reversed. *International Billing Services* asserts that the plaintiff who claims a contractual right to attorney fees is estopped to claim otherwise after it loses the underlying litigation. However, the same principle should apply to the prevailing defendant. If the defendant denied that the plaintiff had a contractual right to attorney fees, it should be equally estopped to assert otherwise thereafter. There is no reason in law or logic why judicial estoppel should apply to one but not the other. Equity suggests that it apply to neither." (*Perez*, at pp. 468-469.) In sum, having failed to gain any advantage following the first trial from its theory that TSP was liable for attorney fees based on the fee provisions in the performance bonds, MTA was not estopped from opposing TSP's claim for fees on the same, erroneous theory in subsequent proceedings.

TSP's argument based on section 1717's principle of reciprocity is no more persuasive than its judicial estoppel claim. The salutary policy underlying the principle of reciprocity was articulated by the Supreme Court in *Reynolds Metals Co. v. Alperson, supra*, 25 Cal.3d 124, which allowed parties who had not signed a note, unsuccessfully sued as the signatory corporation's alter egos, to recover their attorney fees under the fee provision in the note because the plaintiff would have been entitled to recover its fees if it had succeeded in enforcing the note against the nonsignatories: "Section 1717 was enacted to establish mutuality of remedy where a contractual provision makes recovery of attorney's fees available for only one party [citations], and to prevent oppressive use of one-sided attorney's fees provisions. [Citation.] [¶] Its purposes require section 1717 be interpreted to further provide a reciprocal remedy for a nonsignatory defendant, sued on a contract as if he were a party to it, when a plaintiff would clearly be entitled to attorney's fees should he prevail in enforcing the contractual obligation against the defendant." (*Id.* at p. 128.) Similarly, in *Hsu v. Abbara, supra,* 9 Cal.4th at pages 870 through 871, the Court explained, "It is now settled that a party is entitled to attorney fees under section 1717 'even when the party prevails on grounds the contract is inapplicable, invalid, unenforceable or nonexistent, if the other party would have been entitled to attorney's

54

fees had it prevailed.' [Citations] [¶] . . . To achieve its goal, the statute generally must apply in favor of the party prevailing on a contract claim whenever that party would have been liable under the contract for attorney fees had the other party prevailed." (Accord, *Santisas v. Goodin, supra*, 17 Cal.4th at p. 611 [§ 1717 allows a party who defeats a contract claim by showing the contract did not apply or was unenforceable to recover attorney fees under that contract if the opposing party would have been entitled to attorney fees had it prevailed].)

The principle of reciprocity does not assist TSP, however, because—as TSP argued in its appeal from the award of fees by Judge Kalin following the first trial and as Judge Kuhl concluded in denying TSP's motion for attorney fees in the 2011 postjudgment proceedings—MTA would not have been entitled to its fees had it been successful on its B211 and B231 contract claims against TSP. TSP does not suggest otherwise but contends, as it did in connection with its judicial estoppel argument, that MTA's claim for its fees is enough: "[I]n evaluating if the losing party would have been entitled to fees on its claim, the court does not evaluate whether the losing party's claim on the contract was meritorious or was resolved on the merits, only whether, if hypothetically, it would have been entitled to fees had it prevailed on its claims." That is not a correct statement of the law, at least as TSP attempts to apply it to the contractual attorney fee issue here; and TSP's reliance on *Mepco Services, Inc. v. Saddleback Valley Unified School Dist.* (2010) 189 Cal.App.4th 1027 (*Mepco*) to support this overly expansive notion of reciprocity is misplaced.

In *Mepco* a general contractor sued a school district for breach of contract in connection with work it had performed on a school modernization project. The district cross-complained against the contractor (Mepco) for breach of contract and against the contractor and the surety that provided Mepco's performance bond for breach of the performance bond. Following a jury trial judgment was entered in favor of Mepco on its complaint and against the district on its cross-complaint. The Court of Appeal affirmed the judgment, including the award of attorney fees to Mepco. Similar to the situation in

55

the case at bar, the construction contract did not include an attorney fee provision, but the performance bond did. (*Mepco*, *supra*, 189 Cal.App.4th at p. 1045.) However, unlike the performance bonds issued in connection with the B-series contracts here, the performance bond in *Mepco* obligated both the contractor/principal and the surety to pay the district's reasonable attorney fees if the district engaged counsel to enforce the bond: "The effect of this provision is that Mepco and Hartford were jointly and severally liable for any attorney fees that Saddleback might incur in prosecuting an action to enforce the bond." (*Ibid.*) The *Mepco* court recognized the controlling issue on the propriety of fees under section 1717 was "whether Saddleback would have been entitled to its attorney fees if it had prevailed on its performance bond claim." (*Mepco*, at p. 1047.) Concluding that, if the district had prevailed on its claim for breach of the performance bond, it would have been entitled to recover attorney fees from both the contractor and the surety, the appellate court held "Mepco and/or Hartford are entitled to the attorney fees that they incurred in defending against Saddleback's performance bond claim." (*Id*. at p. 1048.) Because that claim and the other contract claims in the lawsuit were closely intertwined, "under the particular circumstances of this case," the court upheld the award of fees incurred in prosecuting the contractor's affirmative claims and in defending against the district's nonperformance bond contract claims. (*Ibid*.)

Thus, *Mepco, supra*, 189 Cal.App.4th 1027, simply applied the established rule, "[A] prevailing party is entitled to attorney fees only if it can prove it would have been liable for attorney fees had the opponent prevailed." (*Perez, supra*, 111 Cal.App.4th at p. 467.) In other words, if the contract the plaintiff seeks to enforce does not contain an enforceable attorney fee provision, whether or not the plaintiff claims it does, neither the plaintiff nor the defendant as prevailing party will be entitled to recover attorney fees. (*Id*. at pp. 467-468; see *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 962, fn. 12 [request for an award of attorney fees in one party's pleading is not sufficient to create a right to recover attorney fees by adverse party who prevails on contract claim when first party "would not *actually* have been entitled to

56

attorney fees under the contract if [that party] had prevailed"].) "For a losing plaintiff to be required to pay attorney fees, the plaintiff's 'bare *allegation* that [h]e is entitled to receive attorney's fees [is] not . . . sufficient'; he also had to have established the attorney fees clauses '*actually* entitled' him to recover fees." (*Bear Creek Planning Committee v. Ferwerda* (2011) 193 Cal.App.4th 1178, 1189; accord, *Leach v. Home Savings & Loan Assn.* (1986) 185 Cal.App.3d 1295, 1307 [a party claiming fees under § 1717 must "establish that the opposing party *actually* would have been entitled to receive them if he or she had been the prevailing party"]; *Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, 899 [same].)

      *Linear Technology Corp. v. Tokyo Electron Ltd*. (2011) 200 Cal.App.4th 1527 (*Linear Technology*), cited by TSP in its reply brief, does not instruct otherwise. Linear sued two companies that had sold it semiconductor processing equipment for breach of statutory warranty after Linear settled a third party's patent infringement claims purportedly arising from use of the equipment it had purchased. The jury found in favor of the defendants, apparently believing defendants' products were not responsible for any harm arising from the patent infringement lawsuit. Based on the largely undisputed evidence presented at trial, the appellate court held the trial court did not err in denying Linear's motion for judgment notwithstanding the verdict. (*Id*. at p. 1534.)

      Turning to the issue of attorney fees, which the trial court had awarded to the defendants, the Court of Appeal agreed with defendants' argument, "if Linear had prevailed on its contract claims, it would have been entitled to attorney fees; consequently, fees were recoverable by respondents under the reciprocity principles expressed in Civil Code section 1717." (*Linear Technology, supra,* 200 Cal.App.4th at p. 1535.) The court did not disagree with Linear's contention that section 1717's reciprocity principles were not triggered simply because it had argued it was entitled to attorney fees. (*Id*. at pp. 1536-1537.) But describing what it described as "'a classic battle of the forms' with certain terms and conditions in conflict," the court explained Linear's version of the purchase order contained an attorney fee provision while the

defendants' did not. (*Id*. at p. 1536.) Thus, the defendants were entitled to attorney fees because Linear would have obtained attorney fees if it had succeeded in showing that the terms of its purchase order became part of the governing contracts. "[T]he question before us is not whether Linear would have been able to *prove* that the attorney fee clause in the purchase order became part of the parties' contract but whether the contract it sought to enforce contained such a clause. Unquestionably it did." (*Id*. at p. 1538.) That is the same standard as articulated in *Perez, supra,* 111 Cal.App.4th 456 and *Bear Creek Planning Committee v. Ferwerda, supra,* 193 Cal.App.4th 1178.

As the court observed in *Perez,* the fallacy in the position asserted by TSP is the assumption that, if the party who claims a contract allows fees prevails in the underlying litigation, it necessarily gets attorney fees. That will often be the case because there is no dispute about the existence or enforceability of the attorney fee provision. But in some cases, as here, the party claiming fees must not only prevail on its contract claim but also prove the contract allows attorney fees. As to the second issue, "[t]he mere allegation is not enough." (*Perez, supra,* 111 Cal.App.4th at p. 468.) "[T]he distinction is between success on the underlying claim of breach and success in proving there is an applicable attorney fee provision." (*Ibid*.) Here, MTA, TSP and the trial court all now agree there is no applicable attorney fee provision that would have entitled MTA to fees against TSP had it prevailed on its B211 and B231 contract claims. Accordingly, there similarly is no basis for an award of attorney fees to TSP as the prevailing party on those claims.

f. *The court erred in denying the Sureties' request for attorney fees*

Although the trial court has broad discretion under section 1717, subdivision (b)(1), to determine which party prevailed on the contract or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees (see, e.g., *Zintel Holdings, LLC v. McLean* (2012) 209 Cal.App.4th 431, 439-440 (*Zintel*)), when the judgment is a "simple, unqualified win" for one party on the only contract claims presented at trial, a trial court has no discretion to deny an attorney fee award to that party under section 1717. (*Hsu v. Abbara, supra,* 9 Cal.4th at p. 876 ["when a defendant

defeats recovery by the plaintiff on the only contract claim in the action, the defendant is the party prevailing on the contract under section 1717 as a matter of law"]; see also *id.* at pp. 875-876 ["when the decision on the litigated contract claims is purely good news for one party and bad news for the other—the Courts of Appeal have recognized that a trial court has no discretion to deny attorney fees to the successful litigant"]; *Zintel*, at p. 439.) However, section 1717, subdivision (b)(2), provides, "Where an action has been voluntarily dismissed or dismissed pursuant to a settlement of the case, there shall be no prevailing party for purposes of this section."[29]

### i. *Contract claims relating to the B211 and B231 performance bonds*

The Sureties assert they were the simple, unqualified winner on all of MTA's claims on the performance bonds for the B211, B221 and B231 contracts and, as such, were entitled as a matter of law to recover their attorney fees pursuant to the fee provisions of their bonds. The trial court rejected this claim, relying primarily on section 1717, subdivision (b)(2), and MTA's 11th hour (or later) dismissal of its claims against the Sureties. The court erred.

As detailed in our summary of the procedural history of this case, the Sureties' exposure on the B211 and B231 contract performance bonds was introduced during the first trial following the imposition of mid-trial terminating sanctions when the court concluded the Sureties' liability was coextensive with TSP's on all three Red Line construction contracts. Prior to that point the only cause of action in MTA's cross-complaint that named the Sureties concerned the B221 contract and related performance bond and involved only liquidated damages for delay in completing portions of the project and alleged quality control violations. The initial judgment against TSP and the Sureties was reversed in *TSP I*, and MTA's subsequent motion for leave to amend the cross-complaint to add the Sureties as cross-defendants and to include potential liability

---

[29] Section 1717, subdivision (b)(2), "overrid[es] or nullif[ies] conflicting contractual provisions, such as provisions expressly allowing recovery of attorney fees in the event of voluntary dismissal or defining 'prevailing party' as including parties in whose favor a dismissal has been entered." (*Santisas v. Goodin, supra,* 17 Cal.4th at p. 617.)

on the B211 and B231 performance bonds was denied. As to those two contracts, the Sureties were unquestionably the prevailing parties even though their victories were on procedural grounds, rather than on the merits. (*Profit Concepts Management, Inc. v. Griffith* (2008) 162 Cal.App.4th 950, 952, 956 [former employee was party prevailing on the contract and entitled to recover reasonable attorney fees under section 1717 when trial court granted his motion to quash service for lack of personal jurisdiction; employer's argument that a determination on the "merits" of the contract claim is necessary "does not withstand analysis"]; accord, *PNEC Corp. v. Meyer* (2010) 190 Cal.App.4th 66, 71 [holding court may award attorney fees to the moving party under section 1717 following dismissal of an action on a contract for forum non conveniens even though case could be refiled in another state, citing *Profit Concepts* and other cases reaching the same result]; but see *Estate of Drummond* (2007) 149 Cal.App.4th 46, 53 [because of interim nature of order dismissing probate petition to recover attorney fees under compulsory cross-complaint rule, successful clients were not entitled to recover fees under section 1717].)

The Sureties' success in preventing MTA from asserting any claims on the B211 and B231 contract performance bonds in this lawsuit and their consequent entitlement "as a matter of law" to reasonable attorney fees as the prevailing parties on those two bonds were not vitiated by MTA's subsequent dismissal of all remaining claims against the Sureties in October and November 2011. Insofar as the B211 and B231 bonds were concerned, there were no claims left to be dismissed. Whatever effect a dismissal may have had on claims involving the B221 contract performance bond—an issue we discuss below—it did not protect MTA under section 1717, subdivision (b)(2), from an award of the Sureties' fees as the prevailing parties as to those two bonds.

This court's determination in *TSP I* that "[a]ll parties are to bear their own costs on appeal" similarly did not vest the trial court with discretion to deny the Sureties' attorney fees on the B211 and B231 contract performance bonds under section 1717 notwithstanding their "simple, unqualified win" on appeal and thereafter on remand. Although California Rules of Court, rule 8.278(a)(1) authorizes the award of costs on

60

appeal "to the party prevailing in the Court of Appeal in a civil case," rule 8.278(a)(5) provides an exception, "In the interests of justice, the Court of Appeal may also award or deny costs as it deems proper." We exercised that discretion in *TSP I* to direct all parties to bear their own costs.

Our decision as to costs on appeal, however, is entirely separate from a decision about the entitlement to attorney fees under section 1717, either incurred during the appeal itself or in trial court proceedings that preceded or follow the appellate decision. (*Butler-Rupp v. Lourdeaux* (2007) 154 Cal.App.4th 918, 927; see *Mustachio v. Great Western Bank* (1996) 48 Cal.App.4th 1145, 1149-1150.) "In cases where Civil Code section 1717's definition of 'prevailing party' applies, the identification of the party entitled to a fee award must be determined by the final result of the litigation, *i.e.*, after conclusion of the appeal if an appeal is taken. [¶] . . . [T]he party ultimately prevailing on the cause of action cannot be known with certainty until the case is at an end. . . . [¶] . . . [¶] In sum, our prior opinion did not award attorney fees on appeal because none were requested. We did require each side to bear its own costs on appeal. This order, however, had no bearing on the entitlement to attorney fees." (*Butler-Rupp* at p. 928; see Cal. Rules of Court, rule 8.278(d)(2) ["[u]nless the [appellate] court orders otherwise, an award of costs neither includes attorney's fees on appeal nor precludes a party from seeking them under rule 3.1702 [governing claims in the trial court for statutory attorney fees and claims for attorney fees provided for in a contract]"].)

Finally, there is no merit to MTA's argument that, because TSP was properly denied its attorney fees (and costs), the trial court's denial of fees to the Sureties under section 1717 should be affirmed under the unity of interest principle, which vested the trial court with discretion to deny or apportion costs otherwise recoverable by a prevailing party defendant based on the language of Code of Civil Procedure former section 1032, subdivision (b), as it read before the statutes governing recovery of costs were substantially revised in 1986. (See *Zintel*, *supra*, 209 Cal.App.4th at p. 441.) As we explained in *Zintel*, former section 1032, subdivision (b), of the Code of Civil

61

Procedure authorized the award of costs to the defendant "upon a judgment in his favor" in a variety of specified proceedings and expressly provided, "When there are several defendants in any action mentioned in subdivision (a) of this section, not united in interest, and making separate defenses by separate answers, and plaintiff fails to recover judgment against all, the court must award costs to such of the defendants as have judgment in their favor." (Stats. 1957, ch. 1172, § 1, pp. 2464-2465; see *Zintel, supra*, 209 Cal.App.4th at p. 441.) The corollary of this affirmative statement that costs must be awarded to successful defendants who were not united in interest was that courts had discretion to deny costs when they were: "In those instances in which several defendants are united in interest and/or join in making defenses in the same answer, the allowance or disallowance of an award to prevailing defendants lies within the sound discretion of the court." (*Smith v. Circle P Ranch Co.* (1978) 87 Cal.App.3d 267, 272.)

The 1986 legislation repealed former Code of Civil Procedure 1032 in its entirety and replaced it with a new version of the statute. (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1335; *Zintel, supra*, 209 Cal.App.4th at p. 441.) "Under the new statute, '[t]he fundamental principle of awarding costs to the *prevailing party* remains the same, but whether those costs are awarded as a matter of right or as a matter of the court's discretion now depends on how the prevailing party is determined. If a party fits one of the definitions of 'prevailing' listed in C.C.P. 1032(a)(4) . . . that party is entitled as a matter of right to recover costs. [Citations.] In other situations, the prevailing party is determined by the court and the award of costs is discretionary.'" (*Acosta v. SI Corp.* (2005) 129 Cal.App.4th 1370, 1376; accord, *Michell v. Olick* (1996) 49 Cal.App.4th 1194, 1197 ["[a]s rewritten, section 1032 now declares that costs are available as 'a matter of right' when the prevailing party is within one of the four categories designated by statute"].)

As we reviewed in *Zintel,* the overhaul of the controlling statutory language included elimination of the provision that implied the court had discretion to deny costs to a prevailing party defendant who was united in interest with a nonprevailing defendant.

(*Zintel, supra*, 209 Cal.App.4th at p. 442.)  In the revised statute the Legislature specified four categories of litigants who automatically qualify as prevailing parties (Code Civ. Proc., § 1032, subd. (a)(4)) and provided an award of costs must be made to those litigants "[e]xcept as otherwise expressly provided by statute" (Code Civ. Proc., § 1032, subd. (b)).  In light of these changes, we expressed serious doubt whether the Legislature intended any continued use of the nonstatutory unity of interest doctrine (*Zintel*, at p. 442),[30] but did not expressly sign the doctrine's death certificate because, even if it had some continued, limited viability, it did not apply in that case.  (*Id*. at pp. 442-443.)

We now take the final step contemplated by our analysis begun in *Zintel*:  If a party is defined as a matter of law as the prevailing party for the purpose of costs pursuant Code of Civil Procedure section 1032, subdivision (a)(4), or attorney fees under section 1717, subdivision (a), the trial court lacks discretion to refuse to award any costs or attorney fees.[31]  The unity of interest doctrine, founded on language eliminated by the Legislature from the governing statute nearly three decades ago, does not create discretion where none exists or otherwise justify denying costs (including attorney fees when authorized by statute or contract) properly awarded as a matter of right to a prevailing party.

### ii. *Contract claims relating to the B221 performance bond*

Division Four of this court in *Marina Glencoe, L.P. v. Neue Sentimental Film AG* (2008) 168 Cal.App.4th 874 (*Marina Glencoe*) held the mid-trial voluntary dismissal of

---

[30]    We recognized in *Zintel* that, following the 1986 revision of Code of Civil Procedure section 1032, several appellate courts had continued to apply the unity of interest principle to recognize a trial court's authority to award or deny costs to one of multiple, jointly represented defendants presenting a unified defense when the other defendants were not also successful.  (*Zintel, supra*, 209 Cal.App.4th at p. 442.)  However, "[n]one of these decisions fully addresses the change in the underlying statutory language . . . ."  (*Ibid.*)

[31]    The court retains discretion to apportion costs or fees to the extent shared counsel engaged in litigation activities on behalf of both prevailing and nonprevailing parties. (See *Zintel, supra*, 209 Cal.App.4th at p. 443.)

an action while defendant's motion for judgment pursuant to Code of Civil Procedure section 631.8 was pending defeated a claim for contractual attorney fees under section 1717, subdivision (b)(2). The court explained, "Subdivision (b)(2) contains no temporal limitation; it 'bars recovery of section 1717 attorney fees regardless of when the dismissal is filed.'" (*Marina Glencoe*, at p. 877.) "'It is not the stage of the proceedings which distinguishes a voluntary dismissal from an involuntary one. Rather, the key is the plaintiff's role, if any, in bringing it about.' The dismissal in this case, having been entered at [plaintiff's] request, is voluntary. [Citation.] Thus, there is no prevailing party for purposes of recovering attorney fees and costs incurred in defending the contract action under section 1717." (*Id*. at pp. 877-878.)

MTA urges us to follow *Marina Glencoe* and to affirm the trial court's denial of attorney fees to the Sureties under the B221 contract performance bond because on October 8, 2010 it voluntarily dismissed its cause of action for liquidated damages related to TSP's delay in completing the project, which it asserts was the only remaining claim against the Sureties following reversal of the judgment in *TSP I* and the trial court's 2006 denial of MTA's motion to amend. The procedural context of the dismissal "with prejudice" in *Marina Glencoe*, however, was significantly different from circumstances preceding MTA's purported dismissal "without prejudice" of its liquidated damages claim, and the analysis in *Marina Glencoe* does not support the trial court's decision.

There are, as the *Marina Glencoe* court observed, limitations on a plaintiff's right to dismiss a defendant without prejudice, including "when a defendant's right to obtain summary judgment has ripened to the point of inevitability . . . ." (*Marina Glencoe, supra,* 168 Cal.App.4th at p. 878; see *Mary Morgan, Inc. v. Melzark* (1996) 49 Cal.App.4th 765, 770 [voluntary dismissal not permitted after summary judgment hearing has commenced and then continued to permit the gathering of previously unavailable opposition evidence].) "A plaintiff's right to voluntarily dismiss an action before commencement of trial is not absolute, however. [Citations.] 'Code of Civil Procedure section 581 recognizes exceptions to the right; other limitations have evolved

through the courts' construction of the term "commencement of trial." These exceptions generally arise where the action has proceeded to a determinative adjudication, or to a decision that is tantamount to an adjudication.'" (*Bank of America, N.A. v. Mitchell* (2012) 204 Cal.App.4th 1199, 1209.) The test, in practical terms, is whether the plaintiff's intent was to end the litigation or "to manipulate the judicial process to avoid its inevitable end." (*Marina Glencoe*, at p. 878; see *Tire Distributors, Inc. v. Cobrae* (2005) 132 Cal.App.4th 538, 544 ["[t]he legal principles that have evolved in this area tend to focus on the reasons for the dismissal and whether the plaintiff acted in good faith or merely for tactical reasons designed to prevent a defendant from obtaining an otherwise inevitable summary judgment"].)

As discussed, before MTA's October 8, 2010 dismissal without prejudice of its remaining liquidated damages claim against the Sureties, the Sureties had in early May 2010 filed a potentially dispositive motion, arguing they should be dismissed from the lawsuit because, regardless of the outcome of the remaining claims, MTA could not have a net monetary recovery against TSP and the Sureties therefore could not be liable on the performance bond; on September 2, 2010 MTA had formally withdrawn (but not dismissed) the liquidated damages claim; and on September 13, 2010 MTA filed a notice agreeing to have judgment entered on all matters previously adjudicated or otherwise resolved and asking the court to vacate the upcoming trial date. MTA's position the trial date should be vacated and judgment entered was confirmed the following day in court, and counsel for MTA and for TSP and the Sureties and the trial judge actively discussed what the judgment should look like and what posttrial motions would be filed. By this point, termination of the case had already "ripened to the point of inevitability" (*Marina Glencoe, supra,* 168 Cal.App.4th at p. 878), and MTA's subsequent dismissals were a transparent attempt to manipulate the judicial process. To permit MTA to avoid its liability for attorney fees under section 1717 by recognizing its dismissal as valid would be to sanction procedural gamesmanship inconsistent with the purpose of section 1717. (Cf. *Bank of America, N.A. v. Mitchell, supra*, 204 Cal.App.4th at p. 1212 [affirming

award of attorney fees notwithstanding bar of § 1717, subd. (b), because Bank's dismissal following ruling sustaining demurrer without leave to amend was not valid].)

**DISPOSITION**

The judgment in favor of the State on the UCL claim is reversed. The postjudgment order denying the Sureties' motion for attorney fees is reversed and the matter remanded for a determination of the reasonable amount of attorney fees to which they are entitled. In all other respects the judgment and postjudgment orders are affirmed.

The Sureties are to recover their costs on appeal. The other parties are to bear their own costs on appeal.

PERLUSS, P. J.

We concur:

WOODS, J.

SEGAL, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.